362 So.2d 926 (1978)
Kenneth M. MYERS, Petitioner,
v.
Paula F. HAWKINS, Chairman, William T. Mayo, Commissioner, and William H. Bevis, Commissioner, of and Constituting the Florida Public Service Commission, Respondents.
No. 52639.
Supreme Court of Florida.
September 14, 1978.
*927 J. Elliott Messer, Robert S. Goldman and Robert L. Hinkle of Thompson, Wadsworth, Messer, Turner & Rhodes, Tallahassee, for petitioner.
William L. Weeks, Gen. Counsel; and Barrett G. Johnson, Tallahassee, for respondents.
Bruce C. Starling, Gen. Counsel; and Nancy G. Linnan, Asst. Gen. Counsel, Tallahassee, for Reubin O'D. Askew, Governor of the State of Florida.
James D. Whisenand, Deputy Atty. Gen. and Sharyn L. Smith and Frank A. Vickory, *928 Asst. Attys. Gen., for Robert L. Shevin, Atty. Gen. of the State of Florida, Tallahassee, amici curiae.
Philip C. Claypool, Tallahassee, for the State of Florida Commission on Ethics, amicus curiae.
ENGLAND, Chief Justice.
We are asked by Kenneth M. Myers, a member of The Florida Bar and an elected state senator, to review an order of the Florida Public Service Commission which prohibits him from practicing before that agency. The genesis of the present controversy was Myers' request for a declaratory statement from the Commission, pursuant to Section 120.565, Florida Statutes (1977), as to whether he would be permitted to continue practicing before the Commission[1] following the 1976 adoption by the voters of Florida of the so-called "Sunshine Amendment" to the Florida Constitution.[2] Among the provisions added to the Constitution by that amendment was Article II, Section 8(e), which provides in pertinent part:
"No member of the legislature shall personally represent another person or entity for compensation during term of office before any state agency other than judicial tribunals."
The principal issues before us are whether the Public Service Commission is a "judicial tribunal" within the meaning of this provision, and if not whether the amendment applies to legislators in office on its effective date.

I
The Commission answered Myers' request for a declaratory statement by stating its belief that the Commission is a judicial tribunal. It nonetheless denied his right to continue practice before the Commission so that the issue could be passed upon by this Court. The governor and the attorney general, as amici curiae before the Court, challenge the propriety of this entire proceeding on the ground that the Florida Commission on Ethics, an entity created by the Sunshine Amendment,[3] is the only governmental body empowered to determine what is or is not a "judicial tribunal" within the meaning of Section 8(e).
We share amici's view that the Administrative Procedure Act, Chapter 120, Florida Statutes (1977), is not the appropriate mechanism by which to determine the meaning of ambiguous constitutional terms.[4] Indeed, declaratory statements authorized by Section 120.565 are particularly unsuited to that purpose. That section is available only to persons seeking to determine "the applicability [to them] of any statutory provision or of any rule or order of the agency." (Emphasis added.) In this case the Public Service Commission endeavored to couch its order in a manner which would declare the applicability of one of its rules of practice to Myers. Nonetheless, it is quite clear that Myers had been and remained eligible to practice before the *929 Commission but for Article II, Section 8(e) of the Constitution.[5] We now hold that an affected agency is not the appropriate body to make a determination of its own status under Section 8(e)  only the Ethics Commission should make those determinations.
Nevertheless, we recognize that the procedure employed by Myers in this instance was dictated by necessity. Prior to the effective date of the Sunshine Amendment, Myers had asked the attorney general for an opinion as to his right to practice before the Public Service Commission in light of the amendment's apparent prohibition. The attorney general consulted with the executive director of the statutory predecessor of the Ethics Commission and concluded that Myers would be prohibited from practicing before the Commission.[6] (The attorney general was and is required by law to render assistance to the Ethics Commission when requested.)[7] There is no reason to believe that Myers would have obtained a different legal opinion had he requested one from the Ethics Commission after the effective date of the Sunshine Amendment, since the matter undoubtedly would have been referred again to the attorney general for advice. For this reason alone, we decline to remand this case to the Public Service Commission to discharge the proceeding under Section 120.68(13)(a), Florida Statutes (1977). The courts will not require parties to engage in a series of useless acts. Kawasaki of Tampa, Inc. v. Calvin, 348 So.2d 897, 901 (Fla. 1st DCA 1977). Accordingly, we take this occasion to construe the term "judicial tribunal" in Article II, Section 8(e) of the Florida Constitution, and to resolve Myers' status before the Commission.

II
The term "judicial tribunal" is found in the Florida Constitution only in Section 8(e) of Article II, although the terms "courts" and "administrative agencies" are used elsewhere frequently. We presume that the language differentiation was intentional.[8]
Amici allege that the term was drafted by the governor[9] to prohibit legislators from appearing before all bodies of state government except three  the courts, the Industrial Relations Commission, and the judges of industrial claims. They rely on materials submitted as an appendix to their brief, basically comprising the governor's early drafts of the proposed initiative petition which used the term "courts" and a written request of the chairman of the Industrial Relations Commission to expand the proposed terminology to embrace that tribunal and industrial claims judges.
Myers argues, basically, that whatever may have been the governor's intent when he selected this term for the Constitution, his intent is less important than the understanding of the voters to whom it was submitted for adoption. He suggests that the governor's thought processes and drafting materials were not available to the people of Florida before their vote, and that they were guided only by the bare terminology in the proposal and an explanatory flyer which accompanied the petition when it was circulated for placement on the ballot. The flyer's only reference to this provision stated:
"The subsection also prohibits members of the legislature from representing clients before state agencies except before judicial tribunals. Judicial tribunals would include the courts, the Industrial *930 Relations Commission and judges of industrial claims."
Myers maintains that the critical word "include" is patently non-exclusive, and that the agencies listed behind it would be understood by the average voter to be examples of non-court tribunals rather than an enumeration of the only ones covered.
We have already held that the intent of the framer of a constitutional provision adopted by initiative petition will be given less weight in discerning the meaning of an ambiguous constitutional term that the probable intent of the people who reviewed the literature and the proposal submitted for their consideration. Williams v. Smith, 360 So.2d 417 (Fla. 1978).
We are charged, then, to divine how the term "judicial tribunal" and the word "include" were generally perceived by the voters of Florida. To perform this task we initially consult widely circulated dictionaries, to see if there exists some plain, obvious, and ordinary meaning for the words or phrases approved for placement in the Constitution.[10] There appear two simple enough definitions in Webster's Third New International Dictionary (1971), where the words "judicial" and "tribunal" are defined, respectively, to mean:
"judicial: of, relating to, or concerned with a judgment, the function of judging, the administration of justice, or the judiciary ... [;] of, characterized by, or expressing judgment [;] ... belonging or appropriate to a judge or the judiciary [.]" (Webster's at 1223.) "tribunal: ... the seat of a judge or one acting as a judge: the bench on which a judge and his associates sit for administering justice ... [;] a court or forum of justice: a person or body of persons having authority to hear and decide disputes so as to bind the disputants ... [;] something that decides or judges: something that determines or directs a judgment or course of action [.]" (Id. at 2441.)[11]
The word "include" is defined in the same dictionary to be non-exclusive, as Myers suggests.[12]
Beyond merely finding dictionary definitions for these terms, however, we are always obliged to interpret a constitutional term in light of the primary purpose for which it has been adopted.[13] Both Myers and the amici recognize that the Sunshine Amendment was evolved to establish an arsenal of protections against the actual and apparent conflicts of interest which can arise among public officials, and that Section 8(e) was designed specifically to prevent those who have plenary budgetary and statutory control over the affairs of public agencies from potentially influencing agency decisions (or giving the appearance of having an influence) when they appear before the agencies as compensated advocates for others.
Bearing in mind the agreed purpose of the provision, we see our responsibility, essentially, as having to draw a line between two closely related alternatives.[14] A first alternative is that the term "judicial tribunals" includes only courts (as delineated in *931 Article V of the Florida Constitution), the Industrial Relations Commission, and the judges of industrial claims. Amici urge this position on three grounds: the gloss evident from the governor's development of the phrases; the fact that we recently declared the Industrial Relations Commission to be "a judicial tribunal meeting constitutional requirements;"[15] and the desirability of construing an exception to the constitutional constraint on conflicts of interest as narrowly as possible. A second alternative, urged by Myers, is that the term includes not only the three bodies named but also the Public Service Commission and select other agencies which perform functions in a manner equivalent to the judicial branch of government.[16] Myers argues for this construction on the ground that judicial tribunals which the Section 8(e) exception would "include" generally would be understood by the average voter to encompass governmental bodies which possess four basic hallmarks: proceedings which are adversary; an impartial group of decisionmakers; the power to issue final orders which the agency itself may enforce; and an identifiable standard of appellate review which tests for due process in the agency's decisional processes. This test to determine what is or is not a judicial tribunal, Myers argues, accords with both principles of constitutional construction which are appropriate here  that is, the likely common understanding of the term employed, and the need for consistency between the obvious purpose of the provision and the circulated explanation.
Myers persuasively suggests that we focus our attempt to identify exempted non-court judicial tribunals by reference to publicly-perceived characteristics of the agencies, rather than the technical materials leading to the selection of the terminology. It does not follow, however, that the use of Myers' suggested test will produce the consequence which he suggests. That depends on whether we accept his further suggestion that the range of included agencies should be broadly construed to encompass those which possess the requisite judicial characteristics for some aspect of their activities, rather than those which possess those characteristics for all (or virtually all) of their activities.[17] That choice, we believe, is dictated by the Constitution itself.
Article II, Section 8(e), governs representation by legislators "before any state agency other than judicial tribunals." The thrust of the prohibition is to distinguish judicial tribunals from all other state agencies; it is not to identify functions within multi-faceted agencies which may, in part, have characteristics judicial in nature. The obvious proscription against legislators is in relation to governmental bodies, not to governmental functions. By confining the constitutional exception to judicial activities, we track the conceded purpose of the prohibition more precisely than the other alternative would allow. Moreover, this conclusion avoids the troublesome problem of searching among diverse responsibilities of each commission, agency and board of the state to determine whether it is endowed to *932 some degree with the four critical characteristics.[18]
Applying the "predominant characteristics" test described above, we find that although the term "quasi-judicial" has been used to refer to some of the Public Service Commission's functions,[19] the statutory range of the Commission's responsibilities is so vast that the agency in fact exercises judicial-like powers in performing only a fraction (albeit a highly visible and significant fraction) of its duties.[20] Plainly, the exercise of judicial-like powers by the Commission is not inherent in all (or virtually all) of its statutory activities, and we are satisfied that it would not have been perceived by the public as being a judicial tribunal. Industrial relations commissioners and judges of industrial claims, in contrast, do meet the appropriate requirements for a judicial tribunal under Article II, Section 8(e).[21] There may be other agencies which satisfy that standard, but clearly the Public Service Commission does not.
We hold, therefore, that the term "judicial tribunals" in this provision of the Florida Constitution includes the judges of industrial claims, the Industrial Relations Commission, and all courts of the state created under Article V of the Constitution. (We do not now decide whether there may exist other agencies which may be "judicial tribunals" within the contemplation of Article II, Section 8(e), because they have as their sole, or virtually exclusive responsibility, the resolution of controversies.)

III
Inasmuch as Article II, Section 8(e), bars the appearance of legislators before the Public Service Commission, we are forced to consider whether the prohibition extends to legislators in office when it became effective.[22] The issue is a difficult one. In addition to the complexity of the narrow legal question posed, it is apparent that our decision with respect to the applicability to incumbent legislators of the "during term" prohibition in Section 8(e) will determine as well the applicability, to a variety of incumbent officeholders, of the two-year "after term" ban, containing identical operative language, which appears as the first sentence of the same constitutional provision.[23]
*933 We can quickly dismiss any concern that Section 8(e) has retroactive effect with respect to Myers' pre-1977 practice before the Public Service Commission. No one suggests that his representation of clients at the Commission before the amendment became effective has breached the public trust.[24] The question posed here, although cast by the parties in terms of the amendment's "retroactivity" and "prospectivity,"[25] is whether the application of Section 8(e) after its adoption impermissibly impairs, during the unexpired portion of Myers' four-year elective term, any of the rights, duties, or privileges appertaining to or dependent upon his public office. Five Florida decisions are said to bear on this question, but three of them are readily distinguishable.
In State ex rel. Judicial Qualifications Commission v. Rose, 286 So.2d 562 (Fla. 1973), the Court refused to apply to an incumbent judge a constitutional amendment creating a mandatory retirement age which he had passed at the time the amendment became effective. The Rose decision, however, is not really helpful here. There the Court was obliged to reconcile two competing provisions of the newly adopted constitution, one elevating Judge Rose to the status of a circuit judge as of January 1, 1973, and the other prohibiting judicial service by persons who had attained his then age. The Court reconciled these two provisions to prevent the ridiculous result of "elevating" a judge to a position he was instantly ineligible to occupy.[26] Obviously the problem there has no parallel here.
In Johnson v. Trader, 52 So.2d 333 (Fla. 1951), the Court refused to apply a city ordinance enacted to prohibit civil service employees from engaging in a liquor business to a Pensacola policeman who owned a liquor enterprise, without a reasonable post-adoption period for compliance. In Johnson, of course, the Court was forced to resolve a practical dilemma posed by the precipitous enforcement of the municipality's reasonable regulation governing the conduct of civil service employees. In so doing, the Court fashioned an equitable resolution for the parties grounded on the *934 factual peculiarities of the manner in which the city had handled its transactions with officer Johnson, and on the need for concern with his accrued pension benefits.[27] No similar due process concern or vested property right affects Myers' situation.
In Hall v. Strickland, 170 So.2d 827 (Fla. 1964), the Court upheld a Dade County charter amendment which terminated the offices of certain incumbent judges whose terms had not expired. In Hall the Court was confronted with two questions: whether a constitutional ban against shortening the term of an incumbent judge was applicable at all to a court created by municipal ordinance, and whether the municipality's particular court was abolished or its incumbent judges removed. By deciding that the constitutional prohibition did not apply at all because of the particular court involved, and that the court was abolished rather than its judges removed, the Court avoided issues (like the one before us) relative to the abridgement of an incumbent officeholder's term.
More akin to the present situation are Holley v. Adams, 238 So.2d 401 (Fla. 1970), and State ex rel. Reynolds v. Roan, 213 So.2d 425 (Fla. 1968). In Reynolds the Court refused to allow a school board to oust its appointed superintendent  an attempt grounded on a constitutional amendment directing that school board superintendents shall serve at the pleasure of their appointing boards  when the incumbent superintendent had received a pre-amendment board appointment for a fixed term extending beyond the amendment's effective date. The Court's opinion discussed to some extent whether superintendent Reynolds' appointed term was definite, and thereby continuable to the end of its preamendment contract duration, or indefinite, and thereby subject to the newly-created termination authority. The Court's decision hinged, however, on an absence of express language in the constitutional amendment directing its application to existing contracts.[28]
"[A]n intention to apply the shortened term of an office, or the changed qualifications thereof, to an incumbent, resulting in his ouster from the office before the end of his term, must be clearly expressed in the statute or constitutional amendment making the change before it will be given that effect."[29]
In Holley, by contrast, the Court did apply a newly-enacted statute to incumbent officeholders  forcing a direct curtailment of the term of office  but nowhere identified the presence of an unambiguous directive in the statute to the effect that it should apply to incumbents. Apparently, the Court there approached the applicability problem from another perspective. By first concluding that the so-called "resign-to-run" statute did not affect the qualifications of office[30] or shorten by its operation the term of office,[31] the Court eliminated any possible reasons that the statute should not apply to incumbents. By this approach the need to consider an expression of intent in the statute became unnecessary, since the impermissible feature of statutory or constitutional change  an effective "ouster"  was not present in the enactment.
Whether we approach the applicability of Section 8(e) from the perspective of Reynolds or Holley, the conclusion is the same  Section 8(e) should not be considered applicable to persons in office on its effective date.[32]
*935 A Reynolds approach would assume for the purpose of discussion an effective ouster by the constitutional amendment and direct our attention to whether the amendment on its face expresses an intention that it be applied to those in office. If not, the amendment would not be so applied. There can be no disagreement that Section 8(e) on its face, or even in conjunction with other provisions of the Sunshine Amendment, does not express a clear and unequivocal intention to apply its strictures to existing officeholders.[33] Compare the expressions of intended application in the provisions construed in Hall v. Strickland, 170 So.2d 827 (Fla. 1964), and in Klein v. Schulz, 87 So.2d 406 (Fla. 1956). Under a Reynolds approach, then, even assuming that Section 8(e) affects the qualifications of office, the absence of clear language applying it to incumbents prevents its applicability to Myers.
A Holley approach focuses attention directly on the question assumed under a Reynolds approach  whether the constitutional change has abolished the office, changed the qualifications of office, or imposed new and onerous requirements on some or all of the incumbents who desire to continue in office.[34] The resign-to-run law considered in Holley led the Court to conclude that neither an ouster nor an impermissible burden on officeholding was imposed.[35] The same cannot be said of Section 8(e). To apply newly-created professional limitations on a part-time Florida legislator in the midst of his term of office obviously defeats expectations honestly arrived at when the office was initially sought.[36] The office itself is not abrogated or its duties altered, of course, but the privileges of officeholding are no less impaired by curtailing non-legislative employment opportunities than they would be if the office was made full-time and outside employment prohibited altogether.[37] The abridgement in either case is tantamount to changing the qualifications of office. There was absolutely no employment limitation when the term of office was sought.[38]
We hold, therefore, that Section 8(e) does not apply to affected officials  legislators and statewide elected officers  who held office on its effective date.[39] Myers, therefore, is not barred from practicing before *936 the Public Service Commission for compensation on behalf of others during his senatorial term which began prior to January 4, 1977. The order of the Public Service Commission is quashed.
It is so ordered.
ADKINS, BOYD, OVERTON and HATCHETT, JJ., concur.
NOTES
[1] Myers, who was first elected to his senatorial seat on November 5, 1968, has specialized in a public utility law practice, which often requires representation before the Public Service Commission. He is registered with the Commission as a "class A" practitioner under its Rule 25-2.13, Florida Administrative Code.
[2] Art. II, § 8, Fla. Const. This provision was proposed by the governor's initiative petition in July 1976 and approved by the voters of Florida on November 2, 1976. It became effective on January 4, 1977. For additional history, see Williams v. Smith, 360 So.2d 417 (Fla. 1978).
[3] Article II, Section 8(f) of the Constitution states:

"There shall be an independent commission to conduct investigations and make public reports on all complaints concerning breach of public trust by public officers or employees not within the jurisdiction of the judicial qualifications commission."
[4] Generally speaking, administrative agencies are not the appropriate forum in which to consider questions of constitutional import. See Department of Revenue v. Amrep Corp., 358 So.2d 1343 (Fla. 1978); Gulf Pines Memorial Park, Inc. v. Oaklawn Memorial Park, Inc., 361 So.2d 695 (Fla. 1978); Department of Revenue v. Young American Builders, 330 So.2d 864 (Fla. 1st DCA 1976).
[5] The artificiality of this declaratory proceeding is apparent from the Commission's "decision" that it is a judicial tribunal and its "order" that it is not.
[6] 1976 Op. Att'y Gen. Fla. 076-242 (Dec. 22, 1976).
[7] § 112.322(5), Fla. Stat. (1975), now appearing as § 112.322(6), Fla. Stat. (1977).
[8] See State ex rel. Gibbs v. Couch, 139 Fla. 353, 376, 190 So. 723, 732 (1939) (Whitfield, J., concurring); Mugge v. Warnell Lumber & Veneer Co., 58 Fla. 318, 321, 50 So. 645, 646 (1909); Halle v. Einstein, 34 Fla. 589, 604, 16 So. 554, 558-59 (1894).
[9] As to the governor's role as draftsman of the "Sunshine Amendment," see Williams v. Smith, 360 So.2d 417 (Fla. 1978).
[10] See, for example, Hillsboro Island House Condominium Apartments, Inc. v. Town of Hillsboro Beach, 263 So.2d 209, 213 (Fla. 1972). In general, a dictionary may provide the popular and common sense meaning of terms presented to the voters.
[11] Definitions supplied by Black's and Ballentine's law dictionaries are quite similar. See Ballentine's Law Dictionary 684, 1300 (3d ed. 1969); Black's Law Dictionary 983-84, 1677 (4th ed. 1968).
[12] See Webster's at 1143.
[13] Gray v. Bryant, 125 So.2d 846 (Fla. 1960); State ex rel. McKay v. Keller, 140 Fla. 346, 191 So. 542 (1939).
[14] Two other alternatives  to hold that the term "judicial tribunal" means either only those courts created by Article V of the Florida Constitution or all agencies which possess quasi-judicial power within the contemplation of Article V, Section 1 of the Florida Constitution  are not urged by either party. In light of the explanatory material which accompanied the initiative petition, we find no basis to adopt either of these more extreme positions, although there is some intellectual appeal to the former.
[15] Scholastic Systems, Inc. v. LeLoup, 307 So.2d 166, 170 (Fla. 1974). At oral argument, the attorney general proposed as a possibility that we overrule Scholastic Systems and pare back the term "judicial tribunal" to courts alone. The posture of this case obviously precludes that possibility.
[16] Agencies which Myers identified in this category include, at least, the Public Employees Relations Commission and the Career Service Commission.
[17] We recognize that the judicial branch of government performs some duties which conceptually could be classified as legislative or quasi-legislative in nature, such as the rulemaking power conferred in Article V, Section 2(a) of the Constitution, and the admission and discipline of attorneys conferred in Article V, Section 15. The administrative responsibilities for adopting rules of practice and procedure for the courts of the state, and for controlling the flow of persons authorized to appear before the courts, are intimately connected with the exercise of courts' exclusively judicial activities. As such they are incidental, but indispensable, to the mission of the courts. They have no other independent significance, however, and to this extent courts differ from most executive and quasi-legislative bodies which exist for reasons other than simply to resolve disputes.
[18] Illustrative of the problem are In re Advisory Opinion to the Governor, 223 So.2d 35 (Fla. 1969); Greyhound Lines, Inc. v. Mayo, 207 So.2d 1 (Fla. 1968); Florida East Coast Ry. v. State, 79 Fla. 66, 83 So. 708 (1920).
[19] See Florida Motor Lines, Inc. v. Railroad Comm'rs, 100 Fla. 538, 129 So. 876 (1930), where, in discussing the authority of the Commission's predecessor, we carefully differentiated the exercise of quasi-judicial authority from the judicial powers of the courts. And see Canney v. Board of Public Instruction, 278 So.2d 260 (Fla. 1973).
[20] The many non-judicial functions of the Public Service Commission prescribed in the Florida Statutes include the authority to franchise and regulate ferries and toll bridges (ch. 347), and extensive rate-making and regulatory authority over railroads and common carriers (ch. 350), telegraph and telephone companies (ch. 364), private wire services and the statewide emergency telephone system (ch. 365), public utilities supplying electricity or gas (ch. 366), public water and sewer systems (ch. 367), and gas transmission or distribution facilities (ch. 368).
[21] We note that a legal background is not required for persons seeking to serve as a public service commissioner. Compare §§ 440.45(1) and 20.17(3)(a)(1), Fla. Stat. (1977), requiring for industrial claims judges and industrial relations commissioners, respectively, virtually the same qualifications as for circuit and district court judges. And see In re Workmen's Compensation Rules of Procedure, 343 So.2d 1273 (Fla. 1977); Scholastic Systems, Inc. v. LeLoup, 307 So.2d 166 (Fla. 1974); In re Florida Workmen's Compensation Rules of Procedure, 285 So.2d 601 (Fla. 1973).
[22] Although this issue was not originally argued by the parties, the Court on its own motion directed that the parties file supplementary briefs addressing this question. See Fla.R. App.P. 9.040(a). As noted earlier, Myers has served in the Florida Senate continuously since 1968. His present four-year term began on November 2, 1976.
[23] In its entirety, Article II, Section 8(e), reads:

"No member of the legislature or statewide elected officer shall personally represent another person or entity for compensation before the government body or agency of which the individual was an officer or member for a period of two years following vacation of office. No member of the legislature shall personally represent another person or entity for compensation during term of office before any state agency other than judicial tribunals. Similar restrictions on other public officers and employees may be established by law."
[24] The retroactive application of a constitutional amendment to pre-adoption conduct was summarily rejected in Baillie v. Town of Medley, 262 So.2d 693, 697 (Fla. 3d DCA 1972), appeal dismissed, 279 So.2d 881 (Fla. 1973).
[25] The labels "retroactive" and "prospective" do not aid our analysis.

"In dealing with the problem of retroactivity, it is extremely difficult to establish definite criteria upon which court decisions can be foretold. A statute must not act unreasonably upon the rights of those to whom it applies, but what is reasonable and what is unreasonable is difficult to state in advance of actual decisions. `... [T]he method to be pursued is not the unerring pursuit of a fixed legal principle to an inevitable conclusion. Rather it is the method of intelligently balancing and discriminating between reasons for and against.' It is misleading to use the terms `retrospective' and `retroactive,' as has sometimes been done, to mean that the act so labelled is unconstitutional, since the question of validity rests on further subtle judgments concerning the fairness or unfairness of applying the new statutory rule to affect interests which accrued out of events which transpired and under circumstances which obtained when a different prior rule of law was in force... .
One of the fundamental considerations of fairness recognized in every legal system is that settled expectations honestly arrived at with respect to substantial interests ought not be defeated. There is evidence that results achieved through application of judicial instinct, manifested in the pattern of decisions on retroactivity problems, are perhaps best explainable in terms of this fundamental principle of justice." 2 Sands, Sutherland Statutory Construction § 41.05, pp. 259-61 (4th ed. 1973).
If there is an appropriate characterization, Florida case law seems to describe the application of a constitutional amendment to conduct following its effective date as prospective in nature. See State ex rel. Judicial Qualifications Commission v. Rose, 286 So.2d 562, 563 (Fla. 1973). And see Department of Health & Rehabilitative Services v. Harrell, 258 So.2d 340, 344 (Fla. 1st DCA 1972), cert. discharged, 272 So.2d 151 (Fla. 1973), using the same term in the context of conduct following a statutory change.
[26] 286 So.2d at 563.
[27] 52 So.2d at 336-37.
[28] Both the Rose and Reynolds decisions express the view that a constitutional provision can operate to eliminate an office or a right, provided the amendment unambiguously expresses that intention. The Hall decision illustrates office abolition.
[29] 213 So.2d at 428.
[30] See Holley, 238 So.2d at 405-06, as to the distinction between the eligibility for office and the qualifications of office.
[31] "[T]he reduction of the term, if any, is caused solely by the act of the office holder in abandoning the office which he presently holds." 238 So.2d at 407.
[32] We express no view on the applicability of a constitutional or statutory change to persons who assume office simultaneously with the effective date of the change.
[33] Indeed, the last sentence of Section 8(e) speaks prospectively of action the legislature may take to expand that provision's coverage to other governmental personnel.
[34] New and onerous requirements for officeholding may be considered the equivalent of an ouster. See 238 So.2d at 406-07.
[35] "[The resign-to-run statute] is not a burden imposed upon the office of circuit judge presently held by Holley. His term of office as circuit judge remains as before and this right is affected only by the voluntary act of the incumbent in office." 238 So.2d at 406.
[36] See Sands, note 25 above.
[37] See, for example, Art. V, § 13, Fla. Const., prohibiting certain outside employment for fulltime judges.
[38] Not every statutory or constitutional impairment in the expectations or in the status of officeholders, either in their official or private capacity, will operate only as to future officeholders. This case does not present an occasion to announce other circumstances in which an impairment would be considered tantamount to an ouster, to use the Reynolds phraseology. Wherever a line may ultimately be drawn to separate permissible impairment from that which is impermissible, it is clear that this constitutional change so substantially abrogates Myers' status as a part-time legislator and as a member of The Florida Bar that it would fall well outside the established boundary.
[39] The inapplicability of the "after term" ban of Section 8(e) to persons in office on its effective date rests on the same policy considerations as the "during term" ban. The joinder of these prohibitions in the same constitutional paragraph, designed as we have indicated to prevent conflicts of private and public interests, quite plainly stems from the same ethical considerations and requires parallel treatment. The Standards and Conduct Committee of the Florida House of Representatives reached this same conclusion in an opinion concerning the applicability of the "after term" ban to House members in office on its effective date. Opin. No. 39, H.R.J., Reg. Sess. 888 (1978).