385 So.2d 1356 (1980)
Philip H. JENKINS, Petitioner,
v.
STATE of Florida, Respondent.
No. 59087.
Supreme Court of Florida.
June 26, 1980.
*1357 Edward A. Garrison of Kohl, Springer, Springer & Garrison, Palm Springs, for petitioner.
Jim Smith, Atty. Gen., and John D. Cecilian, Asst. Atty. Gen., West Palm Beach, for respondent.
SUNDBERG, Justice.
We here address the question whether this Court currently has jurisdiction to review a decision of a district court of appeal which reads in its entirety "Per Curiam Affirmed" where a dissenting opinion is filed in the case. We answer the question in the negative.
Review of the decision of the District Court of Appeal, Fourth District,[*] was sought in this cause by notice to invoke the certiorari jurisdiction of this Court filed April 11, 1980. By his application petitioner asserts that the decision of the district court is in conflict with decisions of other districts or with Supreme Court decisions upon the issue of whether uncorroborated hearsay information from a confidential informant, who had not divulged the source of his information, was sufficient to establish probable cause for a warrantless search of a vehicle. Prior to trial, petitioner moved to suppress evidence seized in a search of his vehicle. The trial court denied the motion to suppress. Petitioner subsequently entered a plea of nolo contendere preserving his right to appeal the trial court ruling. On review the district court affirmed the ruling of the trial court without opinion. On member of the three-judge panel dissented to the decision of the majority in a comprehensive opinion which recited the facts extensively and concluded that under prevailing law the search violated petitioner's fourth amendment rights.
After ratification by the people of this state at an election held on March 11, 1980, article V, section 3 of the Florida Constitution pertaining to the jurisdiction of the Supreme Court was substantially revised. In particular, section 3(b)(3) underwent a dramatic change. Prior to April 1, 1980 (the effective date of the amendment), the provisions of section 3(b)(3) relating to review of conflicting decisions read as follows:
May review by certiorari any decision of a district court of appeal ... that is in direct conflict with a decision of any district court of appeal or of the supreme court on the same question of law... .
Post April 1, 1980, that section reads with respect to review of conflicting decisions:
May review any decision of a district court of appeal ... that expressly and directly conflicts with a decision of another district court of appeal or of the supreme court on the same question of law....
(Emphasis supplied.)
The constitutional amendment must be viewed in light of the historical development of the decisional law extant at the time of its adoption and the intent of the framers and adopters. Our inquiry must begin with the amendment to article V of the Florida Constitution occurring in 1956, whereby the district courts of appeal were created. In grappling with the significance of the revised jurisdiction of this Court, a tone was set early on. In Ansin v. Thurston, 101 So.2d 808, 810 (Fla. 1958), speaking through Justice Drew, the Court said:
We have heretofore pointed out that under the constitutional plan the powers of this Court to review decisions of the district courts of appeal are limited and strictly prescribed. Diamond Berk Insurance Agency, Inc. v. Goldstein, Fla., 100 So.2d 420; Sinnamon v. Fowlkes, Fla., 101 So.2d 375. It was never intended that the district courts of appeal should be intermediate courts. The revision and modernization of the Florida judicial system at the appellate level was prompted by the great volume of cases reaching the Supreme Court and the consequent delay in the administration of justice. The new article embodies throughout its terms the idea of a Supreme Court which functions *1358 as a supervisory body in the judicial system for the State, exercising appellate power in certain specified areas essential to the settlement of issues of public importance and the preservation of uniformity of principle and practice, with review by the district courts in most instances being final and absolute.
To fail to recognize that these are courts primarily of final appellate jurisdiction and to allow such courts to become intermediate courts of appeal would result in a condition far more detrimental to the general welfare and the speedy and efficient administration of justice than that which the system was designed to remedy.
This was followed by Lake v. Lake, 103 So.2d 639 (Fla. 1958), where Justice Thomas again reviewed the history of and purposes for the 1956 amendment to article V and held that in order to fulfill those purposes, a "per curiam" decision without opinion of a district court of appeal would not be reviewed by this Court upon petition for certiorari based on "direct conflict" jurisdiction except in those rare cases where the "restricted examination required in proceedings in certiorari [revealed] that a conflict had arisen with resulting injustice to the immediate litigant." Id. at 643. Some seven years later, however, in an opinion which observed that the rule of Lake v. Lake had been eroded de facto if not de jure by subsequent actions of the Court, a majority of the Court determined that there was jurisdictional power under section 3(b)(3) to review district court decisions rendered "per curiam" without opinion if from the "record proper" conflict with another decision could be discerned. Foley v. Weaver Drugs, Inc., 177 So.2d 221 (Fla. 1965).
In the interim the Court had already concluded that conflict certiorari jurisdiction could be founded on a dissenting opinion to a per curiam majority decision rendered without opinion. Huguley v. Hall, 157 So.2d 417 (Fla. 1963). This position was adopted by a majority of the Court without discussion or rationale and has been subsequently followed without amplification of reasoning. E.g., Autrey v. Carroll, 240 So.2d 474 (Fla. 1970); Commerce National Bank in Lake Worth v. Safeco Insurance Co., 284 So.2d 205 (Fla. 1973). In the Commerce National Bank decision, however, the impediments to relying on the factual statement contained in a dissenting opinion to establish conflict jurisdiction were observed:
When facts and testimony are set forth in a majority opinion, they are assumed to be an accurate presentation upon which the judgment of the court is based. However, a dissent does not rise to a similar level of dignity and is not considered as precedent; note, for example, that West Publishing Company does not offer headnotes for dissents, regardless of their legal scholarship. By definition, a dissent contains information, interpretations or legal analysis which has been rejected in whole or part, by the majority. It is also possible that the majority accepts matters set forth in the dissent, but for other reasons declines to follow its line of thought. The majority is under no compulsion to respond to a dissent or to set out the measure of their reluctance to agree. The issuance of a per curiam opinion without comment or citation of authority remains the prerogative of the majority.
Id. at 207.
More recently, the wisdom of the jurisdictional policies expressed in Foley and Huguley have been brought into question by several members of this Court. See Florida Greyhound Owners & Breeders Association, Inc. v. West Flagler Associates, Ltd., 347 So.2d 408, 408 (Fla. 1977) (England, J., concurring; Overton, C.J., concurring specially); Golden Loaf Bakery, Inc. v. Charles W. Rex Construction Co., 334 So.2d 585, 586 (Fla. 1976) (England, J. and Overton, C.J., concurring); AB CTC v. Morejon, 324 So.2d 625, 628 (Fla. 1975) (England and Overton, JJ., dissenting).
It was against this jurisprudential backdrop and in the face of a staggering case load that in November, 1979, this Court urged the legislature, meeting in special session, to enact a proposed amendment to *1359 section 3 of article V of the Florida Constitution to limit the jurisdiction of the Supreme Court. Times were not unlike the year 1956 when the challenge confronting the drafters of that amendment to the judicial article was described thus:
The means and procedure required to accomplish the improvement were difficult, complicated, tedious and onerous.
Yet the determination was not lacking for congestion in the court of last resort had become almost intolerable. The time had come when the court, working at top speed, with cases, except extremely emergent ones, set in the order of their maturity, was hearing arguments as late as fourteen months after the cases were ready for oral presentation.
......
For about eighteen months after its creation the [Judicial] Council, in periodic meetings, debated and deliberated the method which might most effectively modernize a system that by overloading had ceased to function as it should to assure litigants justice without undue, or even ruinous, delay. The words of Gladstone were often heard: "Justice delayed is justice denied."
Lake v. Lake, 103 So.2d 639, 640-41. The legislature responded through enactment of Senate Joint Resolution No. 20-C, which forms the language of the current section 3 of article V.
At hearings before the legislature and in countless meetings with representatives of The Florida Bar, The Conference of Circuit Judges of Florida, the Appellate Judges' Conference, The League of Women Voters as well as other interested organizations too numerous to recount, members of this Court represented that one of the intents and effects of the revision of section 3(b)(3) was to eliminate the jurisdiction of the Supreme Court to review for conflict purposes per curiam decisions of the district courts of appeal rendered without opinion, regardless of the existence of a concurring or dissenting opinion. These same representations were made consistently to the public at large preceding the ballot on the proposed amendment. There can be little doubt that the electorate was informed as to this matter, because opponents of the amendment broadcast from one end of this state to the other that access to the Supreme Court was being "cut off," and that the district courts of appeal would be the only and final courts of appeal in this state. With regard to review by conflict certiorari of per curiam decisions rendered without opinion, they were absolutely correct.
The pertinent language of section 3(b)(3), as amended April 1, 1980, leaves no room for doubt. This Court may only review a decision of a district court of appeal that expressly and directly conflicts with a decision of another district court of appeal or the Supreme Court on the same question of law. The dictionary definitions of the term "express" include: "to represent in words"; "to give expression to." "Expressly" is defined: "in an express manner." Webster's Third New International Dictionary, (1961 ed. unabr.). The single word "affirmed" comports with none of these definitions. Furthermore, the language and expressions found in a dissenting or concurring opinion cannot support jurisdiction under section 3(b)(3) because they are not the decision of the district court of appeal. As stated by Justice Adkins in Gibson v. Maloney, 231 So.2d 823, 824 (Fla. 1970), "[i]t is conflict of decisions, not conflict of opinions or reasons that supplies jurisdiction for review by certiorari." (Emphasis in original.)
Accordingly, we hold that from and after April 1, 1980, the Supreme Court of Florida lacks jurisdiction to review per curiam decisions of the several district courts of appeal of this state rendered without opinion, regardless of whether they are accompanied by a dissenting or concurring opinion, when the basis for such review is an alleged conflict of that decision with a decision of another district court of appeal or of the Supreme Court. The application for review in the instant case having been filed subsequent to March 31, 1980, it is therefore dismissed.
ENGLAND, C.J., and BOYD, OVERTON, ALDERMAN and McDONALD, JJ., concur.
*1360 ENGLAND, C.J., concurs specially with an opinion.
ADKINS, J., dissents with an opinion.
ENGLAND, Chief Justice, concurring specially.
A detailed recitation of the relevant history of the 1980 jurisdictional amendment is relevant to an understanding of the majority's conclusions as to its applicability in this case.[1]
In his 1978 Report to the Legislature, then Chief Justice Ben Overton recommended the creation of a commission, having broad based participation, to determine the need for an additional district court and to consider district court rather than supreme court review of workmen's compensation cases. In the summer of 1978, newly-elected Chief Justice Arthur England implemented Justice Overton's recommendation by appointing an Appellate Structure Commission chaired by Justice Overton and composed of district, circuit and county court judges, legislators, laymen and members of the bar. Chief Justice England expanded the scope of the commission's inquiry, however, to include a review of the entire appellate system in light of the 1956 goal "to ensure that the district courts of appeal are courts of final appellate review as contemplated by Article V of the Constitution."
In response to its expanded duty, the commission analyzed each category of the supreme court's jurisdiction to determine if cases in those categories were significant or important enough to justify the attention of a then overloaded state high court. Tentative votes, taken at the October 12, 1978 meeting, indicated the commissioners' view that, ideally, mandatory jurisdiction should be restricted to death penalty cases, decisions invalidating statutes or construing the constitution, and bond validation proceedings. Nonetheless, after six months of work, the commission rejected constitutional change to achieve this goal and recommended only that the supreme court's jurisdiction be modified by statute and by rule.
After weeks of intense discussion within the Court and numerous internal drafts of proposed changes, the chief justice, on behalf of a unanimous court, presented virtually every aspect of the commission's recommendations for appellate court reforms to the 1979 legislature. The most notable exception was the Court's rejection of the commission's proposal to alter the jurisdiction of the supreme court solely by rule and by statute. The Court viewed the commission's data as conclusive of the need for a constitutional adjustment, and it refused to deny the voters of Florida the right to refine the jurisdictional role which the constitution had created in 1956.
Statistics developed by the commission had demonstrated, for the first time, that the Court's growing problems were not (as generally believed) attributable to the Court's liberality in accepting cases for review, but rather to the effects of its constitutionally assigned mandatory jurisdiction and the numbers of cases being brought as a result (among others) of Foley v. Weaver Drugs, Inc., 177 So.2d 221 (Fla. 1965). The commission found that "the Court has in reality exercised great restraint in accepting for review the cases over which it has any freedom of choice" and has "granted [discretionary petitions] in less than 5 percent of the cases... ."
The Court proposed a constitutional amendment in April 1979, which was filed by Senator Mattox Hair, chairman of the Senate Judiciary-Civil Committee, as Senate Joint Resolution 714, for consideration at the 1979 regular session of the Florida Legislature. The Court's discretionary jurisdiction under SJR 714 was predicated on district court certifications of decisions in conflict or of questions of great public importance, plus a "safeguard" provision authorizing *1361 the supreme court, on its own initiative, to reach down and obtain for review trial court orders and district court decisions which had substantial importance and required immediate statewide resolution.
The Judicial Council endorsed and supported SJR 714. Under pressure to accept or reject the Court's proposal on very short notice, however, the Board of Governors of The Florida Bar, by a vote of 18 for and 12 against, failed to endorse SJR 714 by the two-thirds vote required by the Board's by-laws. The members of the Board principally objected to SJR 714 because attorney-filed petitions for conflict certiorari review were eliminated, and because the initiative, or so-called "reach down" provision, did not appear to allow attorney-filed suggestions to the Court.
Two Senate Judiciary-Civil Committee hearings were held. Despite the Court's expression of intent to limit severely the exercise of the safeguard or "reach down" provision, that provision was ridiculed by opponents of SJR 714 as "pluck up" power which would destroy the finality of all cases throughout the judicial system. Opposition to SJR 714 also developed from attorneys who expressed a lack of trust in district court judges, or at least in their ability or willingness to recognize, concede, and certify conflicting decisions. At the suggestion of the bill's sponsor, SJR 714 was withdrawn from further consideration during the 1979 regular session, in order to give the Court an opportunity to discuss alternatives with opponents and critics and to seek a consensus substitute by the time of an announced special legislative session in the fall of 1979.
Notwithstanding the fate of SJR 714, the Court gained support for its position that structural change was essential to avoid a potential decline in the quality of its work and its increasing backlogs and delays. Justice Sundberg scheduled a series of meetings with a committee appointed by the president of The Florida Bar, in an effort to review the controversial aspects of the Court's original proposal. A statement of agreed principles was eventually drafted by the bar committee and Justice Sundberg, to advise the bar's Board of Governors and the Court of a consensus that could be reached. This included a proposal to retain discretionary review of written opinions of district courts invoked by attorney-filed petitions asserting decisional conflict. The bar committee made clear the intent to overrule the Foley decision regarding conflict, however, by declaring that only an opinion which "articulates a rule of law ..." should qualify for discretionary review.
At the urging of attorney Tobias Simon and others who feared too severe a narrowing of the Court's review authority, the bar committee presented, as an acceptable alternative plan, discretionary review of "decisions of a district court of appeal which substantially affect the general public interest or the proper administration of justice throughout the state"  a standard based on the American Bar Association model for constitutionally unlimited discretionary review.
After the bar's deliberations, Justice Overton reconvened the Appellate Structure Commission to review the bar committee's statement of principles. At their meeting on September 5, 1979, the commission disagreed with the bar committee's preferential guidelines for discretionary review. At the urging of commission member Tobias Simon the commission opted instead for the alternative  constitutionally unlimited discretionary review  to be restricted by the Court's adoption of rules setting guidelines for its own exercise of discretion.
On September 15, 1979, the bar committee's principles were presented formally to the Board of Governors by the committee's chairman, attorney Benjamin Redding of Panama City. Tobias Simon argued for the alternative, commission-approved approach of constitutionally unlimited discretionary review. The members of the Board of Governors, at the request of Justice Sundberg, agreed to support a Court proposal for constitutional change based either on the committee's principles or the alternative.
*1362 As the Court prepared to submit to the November special legislative session a proposed substitute for SJR 714, the chairman of the American Bar Association's Committee to Implement Standards of Judicial Administration expressed an interest in Florida's court reform effort and chose Tallahassee as the site for the next scheduled ABA Committee meeting. The Committee's national expertise with appellate courts focused, in accordance with the ABA standards, on constitutionally unlimited discretionary review for the supreme court. In discussions with legislative committee members, the Court, and the bar immediately preceding the legislative session, however, the ABA committee members recognized unusual features in the Florida system of which they had not previously been aware. Principal among these was the incredibly large number of appeals (35 per year) filed in death penalty cases, each requiring full record and sentence review. This compared, they noted, with only eight death cases a year in the state with the next highest volume. They also noted the special concern for constitutional conflict resolution jurisdiction, due to the diversity in geographical regions of the state. These and other unique factors, the Committee concluded, adequately explained Florida's proposed deviation from the ABA's model standard of constitutionally unlimited discretionary review.
When the combined Senate-House Judiciary Committees met to consider the Court's new constitutional amendment on the opening day of the three-day November 1979 special session, only two issues in the proposal were very controversial, and these quickly became the focus of attention. The first was the Court's suggestion to remove the constitutional restriction on the selection of supreme court justices, which required appellate district representation on the Court. The other publicly controversial issue concerned review of public utility decisions, most of which were proposed to be transferred from the supreme court for review in the district courts of appeal. The Court's proposal  SJR 20-C  emerged from committees of both chambers of the legislature in essentially the form suggested by the Court, as derived from the bar committee's statement of principles.
SJR 20-C, as amended, was adopted by the Senate by a vote of 38 to 2 on November 28, together with a companion bill (SB 21-C) to accelerate submission to the voters by allowing the proposed amendment to be considered at the special presidential primary election scheduled for March 11, 1980. Immediately following the vote in the Senate, both measures were certified to the House, substituted for comparable House legislation, and adopted without further amendment by a vote of 110 to 2.
During the period between November 28, 1979, and March 11, 1980, active public support for SJR 20-C was undertaken by six of the seven justices of the supreme court,[2] the governor, the attorney general of Florida, and the organized bar. Endorsements for the proposal were sought and received from the conferences of district court, circuit court, and county court judges, the League of Women Voters, the prosecuting attorneys' association, the sheriffs' association, and numerous newspaper and television editorial boards.
The Florida Bar and the Young Lawyers Section of The Florida Bar developed and disseminated promotional literature, and provided speakers both for civic clubs and for media discussions and debates. Promotional literature was distributed widely throughout the state, including targeted explanations of the amendment to employees of the state's electric and telephone companies, and to residents of condominium associations.
Articles supporting passage of the amendment, most authored by justices of the Court supporting the amendment, were published in trade publications such as the journals or monthly newsletters of the Florida Bankers Association, the cattlemen's association, the county commissioners' association, the League of Municipalities, and the *1363 like. Television appearances and radio spots were scheduled whenever possible for the justices supporting the amendment, and for others offering public support for its adoption.
Two dominant themes of persuasion were argued by the proponents. First, the amendment would eliminate delay in the supreme court, both by removing from the Court's docket those district court decisions which had no written opinion, and by eliminating all direct appeals to the supreme court from trial courts (except in bond validation cases and cases in which a death penalty had been imposed). Second, the amendment would reduce the cost of litigation by reducing the number of multiple appeals and by making the district courts truly final in the bulk of matters brought to Florida's appellate courts.
Opposition to the amendment developed from a small group of Florida attorneys organized by Tobias Simon as "Floridians against Limited Access," from one current and one former member of the supreme court,[3] and from the public defenders' association. The main efforts of the opponents were to develop newspaper and television editorial support against the amendment, to develop opposition in local bar associations, and to urge public rejection of the amendment through media appearances. Five dominant themes were espoused.
First, it was suggested to the media that the amendment would limit or cut off entirely their access to the supreme court for the resolution of first amendment cases. Second, local bar associations and the public were told that general access to the Court would be curtailed. Third, it was suggested that district court judges would be given the power to prevent review of their decisions by the supreme court. Fourth, it was urged that the Florida Supreme Court should be like the United States Supreme Court and the ABA's model high tribunal, having constitutionally unlimited discretionary review of district court decisions. Lastly, the opponents inferred that the amendment was unnecessary because the Court's caseload was in fact diminishing and the justices traveled too much.
Immediately before the March 11 vote, the 1980 amendment was endorsed editorially by almost every major, daily newspaper in the state. The official vote for passage on March 11 was 940,420 to 460,266  a 67 percent ratio of voter approval.
The significance of the public discussion concerning the amendment is that it provides a frame of reference by which to ascertain the intent of the voters in adopting the amendment.[4] In this case, the public debate and informational literature make abundantly clear that the voters were asked to approve an appellate court structure having these features:
1. a supreme court having constitutionally limited, as opposed to unlimited, discretionary review of intermediate appellate court decisions; and
2. finality of decisions in the district courts of appeal, with further review by the supreme court to be accepted, within the confines of its structural review, based on the statewide importance of legal issues and the relative availability of the Court's time to resolve cases promptly.
ADKINS, Justice, dissenting.
I dissent.
We are embarking on a course which limits our jurisdiction to matters concerning deep questions of law, while the great bulk of litigants are allowed to founder on rocks of uncertainty and trial judges steer their course over a chaotic reef as they attempt to apply "Per Curiam Affirmed" decisions. When the constitutional amendment is considered in light of historical development of the decisional law (as suggested by the majority), we find regression instead of progression. The majority admits that many will not obtain justice for our jurisdiction will be limited to resolving questions of importance to the public as distinguished *1364 from that of the parties. In Ansin v. Thurston, 101 So.2d 808, 811 (Fla. 1958), cited by the majority, the Court said:
[T]here should be developed consistent rules for limiting issuance of the writ of certiorari to "cases involving principles the settlement of which is of importance to the public, as distinguished from that of the parties, and in cases where there is a real and embarrassing conflict of opinion and authority" between decisions.
The opinion in Ansin v. Thurston, supra was authored by Justice Drew. This interpretation lasted for seven years and then a progressive Court adopted Foley v. Weaver Drugs, Inc., 177 So.2d 221 (Fla. 1965). The rule in Ansin had created problems which were resolved in Foley. In a special concurring opinion in Foley, Justice Drew said:
Many problems have arisen in the interpretation of amended Article V. But there has been no dispute that under the constitutional plan for the administration of justice at the appellate level in this State the responsibility was placed in this Court to keep the law harmonious and uniform... . We must assume, in the absence of something in the record to indicate a contrary view, that an affirmance of a decision of a trial court by a decision of the District Court of Appeal makes the trial court decision the decision of the District Court. So far as the trial judge is concerned and so far as the Bench and Bar who are familiar with the decision of the trial judge are concerned, such judgment is the law of that jurisdiction. I think it would result in utter chaos in the judicial system of this State with three separate District Courts, and the possibility of a fourth in the near future, if it were impossible for this Court to maintain consistency and uniformity of the law in such cases. A different rule of law could prevail in every appellate district without the possibility of correction. The history of similar courts in this country leads to the conclusion that some of such courts have proven unsatisfactory simply because of the impossibility of maintaining uniformity in the decisional law of such state.

177 So.2d at 230.
In Seaboard Air Lines Railroad Company v. Williams, 199 So.2d 469, 472 (Fla. 1967), Justice Drew reiterated his views, saying:
In my concurring opinion in Foley v. Weaver Drugs, Fla. 1965, 177 So.2d 221, I observed: "I think it would result in utter chaos in the judicial system of this State with three separate District Courts, and the possibility of a fourth in the near future, if it were impossible for this Court to maintain consistency and uniformity of the law in [decisions of such district courts merely affirming without opinion] * * *." What has occurred in this case fulfills that prophecy. I, therefore, concur in the foregoing majority opinion.
Under the construction proposed by the majority we will have well-written uniform opinions, but the decisions of the five district courts of appeal will be in hopeless conflict.
The majority says there was little doubt "that the electorate was informed" and proceeds to construe a purported constitutional amendment, the terms of which were not placed on the ballot nor were they explained to the public. While discussions with some segments of the public on background and debates concerning the proposed amendment were instructive, nevertheless, what was submitted to the people for adoption was a statement on the ballot which read: "[p]roposing an amendment to the State Constitution to modify the jurisdiction of the Supreme Court." In discussing the proposed amendment, one news analyst contended:
The ballot says simply that the proposal would "modify the jurisdiction of the Supreme Court," giving the public little insight into the changes it would make in court appeals procedures.
Given the complex nature of those procedures, few voters understand the issue.
Van Gieson, Reform Sought to Ease Court's Load, Tallahassee Democrat, March 9, 1980 at 5b, col. 1.
*1365 A pamphlet entitled "Constitutional Amendments on Florida Supreme Court Jurisdiction ... to be Considered at March 11, 1980, Election" prepared by Manning J. Dauer and Fred Goddard discussed the content of the change in the constitution as follows:
The proposed change to Article 5 does not modify the organization of the State Supreme Court. There was a proposal from the Supreme Court to permit all justices of the State Supreme Court to be from the state at large. The legislature, however, retained subsection A of Section 3 which requires at least one of the justices to be from each of the districts in which the state is divided for district courts of appeal. In sub-section B there are a number of modifications as to the jurisdiction of the Supreme Court. The attempt has been made to retain appellate jurisdiction for the most important cases involving new point of law, the death penalty, constitutional questions, affecting the state constitution or that of the U.S., affecting the construction of new statutes passed by the legislature, affecting disagreements among two or more district courts of appeal, affecting bond validation, and affecting certain cases certified for review by the district courts of appeal. Also, the jurisdiction of the Supreme Court has been changed in one case category, that is, cases from administrative agencies of the state affecting rates charged to consumers or service provided by the electric utilities and gas and phone companies.
On the other hand, many other types of cases will be cut off with the appeal being exhausted at the level of the district courts of appeal. For example, cases involving life imprisonment will now be constitutionally limited to the level of the appellate district court unless the case involves a constitution question, a new statute, or a disagreement in construction among district courts. Writs of certiorari (requests for appeal) would be much more limited. Appeals from state administrative agencies' decisions would ordinarily stop at the district courts of appeal. The Supreme Court would retain, of course, the right to issue writs of certiorari, writs of habeas corpus, writs of prohibition, writs of injunction, and writs of mandamus when it entertained jurisdiction.
The aim of these and other changes is to reduce the caseload on the Supreme Court. The estimate given by the Court is that instead of handling 3000 cases per year, the changes will permit the reduction of the caseload from 3000 to 2000 or less. At the same time, the citizen will be guaranteed justice by having cases heard more quickly and by appeals being adequately considered at the district court level. Finally, in the categories of new issues, or in case of disagreement by lower courts, review is still available at the level of the State Supreme Court.
DAUER, Amendment to Limit Appellate Jurisdiction of the Florida State Supreme Court, 62 Pub.Ad. Clearing Service, Univ. of Fla. Civic Information Ser. 2, 4-5, (1980). (Emphasis supplied.)
The proposed amendment was conceived and composed by the justices of this Court. After the proposal was approved by the legislature, it was decided to place the proposed amendment on the ballot at a special election. See article XI, section 5(a), Florida Constitution. Hopefully, this special election would create interest in the voting populace because it was a special presidential primary election in which a popular homestead amendment giving tax relief would also be considered. The substance of the amendment to be placed on the ballot (section 101.151, Florida Statutes), was as follows: "An amendment to the State Constitution to modify the jurisdiction of the Supreme Court." Justices of the Court and others attempted to explain the contents of the proposed amendment to the public, and there were many discussions.
While the discussions relating to the intent of the framers, referred to by the majority, were instructive as to background, nevertheless, there was only one provision submitted to the voters for adoption: "an amendment to the state constitution to modify the jurisdiction of the *1366 supreme court." Any discussions or debate which may have taken place does not change the provision on the ballot that was approved by the voters. See In Re Advisory Opinion, 223 So.2d 35, 40 (Fla. 1969). Construing this provision (as placed upon the ballot) under the ordinary rules of construction, the voters gave us absolute discretion in determining whether we had jurisdiction of a particular case.
Also, I disagree with the judgment of the majority that language and expressions found in a dissenting or concurring opinion cannot support jurisdiction. The effect of the 1980 amendment is to give us jurisdiction for review of a decision that expressly and directly conflicts with a decision of another district court of appeal. A "Per Curiam Affirmed" is a decision, but no decision can be rendered unless three judges of the district court of appeal participate. Art. V, § 4(a), Fla. Const. (1972). A concurring or dissenting opinion is used by trial judges throughout the state in determining the effect of a "Per Curiam Affirmed" decision. We should glance through the window of our ivory tower and attempt to adjust any confusion in the law which may arise by virtue of statements made in a concurring or dissenting opinion, as it is an integral part of the decision of the district courts of appeal.
There will be occasions when a "Per Curiam Affirmed" decision will cite another case. In some instances the cited case had admittedly been in conflict with other decisions, but, because of the failure of the parties to seek our jurisdiction, the law remained unsettled. Under the construction of the present constitutional amendment, the law will remain unsettled. A heavy case load does not justify our spawning confusion in the judicial system.
The decision of the district court of appeal conflicts with other decisions and creates instability in the law. I would accept jurisdiction.
NOTES
[*] Jenkins v. State, 382 So.2d 83 (Fla. 4th DCA 1980).
[1] This recitation is extracted from an article to be published later this year in 32 U.Fla.L.Rev., Vol. 2 (Winter 1980), entitled "Constitutional Jurisdiction of the Florida Supreme Court: 1980 Reform." Detailed, supporting footnotes have been omitted here. For an abridged version of this article, see England, Hunter & Williams, An Analysis of the 1980 Jurisdictional Amendment, 54 Fla.B.J. 406 (1980).
[2] Justice Adkins publicly opposed the amendment.
[3] Former Justice B.K. Roberts publicly opposed the amendment.
[4] Myers v. Hawkins, 362 So.2d 926 (Fla. 1978).