103 So.2d 639 (1958)
Lillian LAKE, Petitioner,
v.
Vincent LAKE, Respondent.
Supreme Court of Florida.
June 11, 1958.
*640 Ollie Ben Butler, Jr., Butler & DeLeon and Heriberto DeLeon, Tampa, for petitioner.
Thomas Hamilton and B.J. Driver, Clearwater, for respondent.
THOMAS, Justice.
This controversy comes to this court on a petition for certiorari in an attempt to have reviewed a judgment of the District Court of Appeal, Second District, disposing of the litigation with the single word: "Affirmed." It is petitioner's position that the Supreme Court should grant the petition because facts of the present case are "very similar" to those with which this court dealt in Dye v. Dolbeck, 114 Fla. 866, 154 So. 847, when an opinion was rendered with which, so he contends, the effect of the ruling of the Circuit Court for Pinellas County in the present case, approved by the District Court of Appeal, is in conflict.
Simple as the situation appears it deserves special discussion because it involves a construction of pertinent parts of Article V of the Constitution of Florida as amended in 1956, F.S.A., and prompts not only an examination of the provisions but also the history that formed the background of the amendment and the ends it was designed to accomplish.
In the beginning we announce that all italics are supplied.
To begin, it can be stated with emphasis and accuracy that the members of the Bench and Bar and laity of the State who were instrumental in formulating the amendment and presenting it to the electorate were motivated by the earnest desire to improve the administration of justice. Stated otherwise, the betterment of the judicial process would come if administration of justice could be made more expeditious, more inexpensive, more sure.
The means and procedure required to accomplish the improvement were difficult, complicated, tedious and onerous.
Yet the determination was not lacking for congestion in the court of last resort had become almost intolerable. The time had come when the court, working at top speed, with cases, except extremely emergent ones, set in the order of their maturity, was hearing arguments as late as fourteen months after the cases were ready for oral presentation.
In the meantime the Bar of Florida had been metamorphosed by court order from a voluntary organization to an integrated body.
Among the movements in a progressive program of the profession, now officially designated The Florida Bar, was the effort to solve the problem of congestion in all the courts by fostering a study of the entire judicial system with all its ramifications.
In furtherance of this worthy cause The Florida Bar through its legislative committee caused to be introduced in the legislature a bill creating a Judicial Council to make an extensive study of the operation *641 of the courts, to report annually to the governor its findings, and to make recommendations to the legislature with reference to steps that might be taken to solve a problem that was ever becoming more serious.
Largely because of the efforts of The Florida Bar the bill was enacted into law. Chapter 28062, Laws of Florida, Acts of 1953; Sec. 43.15, Florida Statutes 1957, and F.S.A.
Under the act the Council was to be composed of an active or retired justice of the Supreme Court, the Attorney General or one of his assistants, a circuit judge, a judge of a court having probate jurisdiction, four lawyers and nine laymen. This Council differed from similar bodies in other states in the remarkable respect that a majority of its personnel were not members of the profession.
For about eighteen months after its creation the Council, in periodic meetings, debated and deliberated the method which might most effectively modernize a system that by overloading had ceased to function as it should to assure litigants justice without undue, or even ruinous, delay. The words of Gladstone were often heard: "Justice delayed is justice denied."
The councilmen were prepared and determined to meet the problem head-on, grapple with it, and solve it. But how?
After mature consideration based on study not only of the Florida system but also of systems adopted or proposed in other states it was decided that effective reform could be accomplished only by amending the organic law. This decision brings into focus the question immediately involved, namely, the extent to which the Supreme Court is empowered to go in entertaining petitions to review the decisions of district courts of appeal. This extent of review is measured by the power defined in the amendment to which many references will later be made.
The expansion of facilities for the consideration and determination of matters on appeal was obviously necessary because there was no reason to anticipate a decrease in litigation in a State that was experiencing a growth that was remarkable if not fabulous.
The possibility that the need could be met by enlarging the membership of the Supreme Court was explored, debated, considered, and discarded. Not only did the method seem impractical but everyone could remember the rejection by the electorate, in 1952, of an amendment to the Constitution to add three members to this body. Committee Substitute for Senate Joint Resolution No. 290, Laws of Florida, 1951, p. 1896. Once it was decided that increase of manpower in the Supreme Court was impractical, the Council turned to a consideration of the establishment of district courts of appeal.
These courts could be created by statute but the weakness of establishing them in such fashion was two-fold. In the first place the jurisdiction of the Supreme Court as it was defined in the Constitution could not be curtailed by statutory law, so a litigant who had been heard on appeal by a statutory district court might still assert a constitutional right to invoke the jurisdiction of the Supreme Court. In such procedure accuracy might be more nearly approached, because of the participation of more judges, but surely the cost in time and money would be maximized. In the second place, for these very reasons it would be difficult, if not impossible, to convince the people that the expense of the new courts would be justified.
To meet these objections, which were plainly well-founded, it was the judgment of those who struggled with the problem that the formation of district courts of appeal could be conscientiously recommended to the people if the powers and jurisdiction of the Supreme Court were so defined and confined that there would be no danger of the district courts of appeal becoming *642 way stations on the road to the Supreme Court.
They are and were meant to be courts of final, appellate jurisdiction. Diamond Berk Insurance Agency, Inc., v. Goldstein, Fla., 100 So.2d 420; Ansin v. Thurston, Fla., 101 So.2d 808. If they are not considered and maintained as such the system will fail. Sustaining the dignity of decisions of the district courts of appeal must depend largely on the determination of the Supreme Court not to venture beyond the limitations of its own powers by arrogating to itself the right to delve into a decision of a district court of appeal primarily to decide whether or not the Supreme Court agrees with the district court of appeal about the disposition of a given case.
It seems trite to remark that everyone concerned wishes to see justice done. It can be stated without hesitancy, qualification, or reservation, that every man is entitled to his day in court. He is vouchsafed a fair trial and he is secured a fair hearing on an appeal which he may take as a matter of right. But he is not entitled to two appeals.
The quality of justice may not be gauged by the treatment accorded one litigant without regard for his adversary. Justice should be done, but not overdone. When a party wins in the trial court he must be prepared to face his opponent in the appellate court, but if he succeeds there, he should not be compelled the second time to undergo the expense and delay of another review.
It was never purposed to provide the review which petitioner now seeks by invoking the provision of the second paragraph of Sec. 4(b) of Amended Article V of the Constitution that gives the Supreme Court permissive jurisdiction to "review by certiorari [a writ of grace as distinguished from one of right] any decision of a district court of appeal * * * that is in direct conflict with a decision of another district court of appeal, or of the supreme court on the same point of law * * *." This is one of three instances designated in the paragraph justifying consideration of the writ when a decision of a district court of appeal is involved. Although we are presently concerned only with the one quoted, the other two should be mentioned because of the character common to the three. They deal with matters of concern beyond the interests of the immediate litigants.
Turning now to the other two, a decision affecting all constitutional officers of like capacity would likely be of grave concern to the public, for illustration, a decision relating to all superintendents of public instruction because of its effect on the school system; one dealing with all sheriffs because of the effect upon law enforcement; one concerning all taxing officials because of the influence upon public finances. The other provision specifies in terms that a petition for certiorari may be entertained by the Supreme Court if the decision involves a question of "great public interest," and, in the nature of a condition precedent, it is certified by the district court of appeal that such is the case.
Both situations, then, are ones in which the public may have an intense concern growing out of private litigation.
Reverting now to the provision relevant to the present petition we say that it, too, is in the category. To remain stable, the law administered by the Supreme Court and the district courts of appeal must be harmonious and uniform. Were there not a central authority to keep it so it could happen that a district court of appeal would decide a given question of law one way and another district court of appeal another way, or one of them contrary to a former decision of the Supreme Court, through oversight or inadvertence, resulting in obvious confusion. To forestall any uncertainty that might derive from such situations, however infrequent, the provision was included in the amendment.
*643 This uniformity and harmony of decisions is necessary, too, to litigants of the future for upon the decisions of the past they must rely.
If in a particular case an opinion is rendered by a district court of appeal that prima facie conflicts with a decision of another district court of appeal or of the Supreme Court on the same point of law, the writ of certiorari may issue and, after study, may be discharged, or the decision of the district court of appeal may be quashed or modified to the end that any conflict may be reconciled. But at this late day in the progress of the litigation the standardization of decisions on the same point of law will have become primary, the effect upon the immediate litigants consequential.
It is another matter, however, for the Supreme Court to dig into a record to determine whether or not a per curiam affirmance by a district court of appeal conflicts with the interpretation the petitioner's counsel has placed upon former decisions in advancing his client's cause. By such procedure the safeguard intended by the pertinent provision would be distorted so that a suitor who had had one day in the appellate court would have a second.
We assume that an appeal to a district court of appeal will receive earnest, intelligent, fearless consideration and decision. When it does, except for the narrow avenue described by the provisions we have cited, the litigant gets a decision by a final appellate court. Thus justice is assured to all, injustice to any is prevented.
There may be exceptions to the rule that this court will not go behind a judgment per curiam, consisting only of the word "affirmed" which does not reflect a decision that would interfere with settled principles of law, rendered by a district court of appeal, but the present case cannot be considered one. Conceivably it could appear from the restricted examination required in proceedings in certiorari that a conflict had arisen with resulting injustice to the immediate litigant. In that event the exception, not the rule, would apply. But if the Supreme Court undertakes to go behind a judgment on the tenuous theory that it must see that justice is done instead of giving to the judgment the verity it deserves and assuming that justice has been done the system that has been overwhelmingly approved by the people will be undermined and weakened.
The writ of certiorari is, accordingly, discharged.
TERRELL, C.J., THORNAL and O'CONNELL, JJ., and WIGGINTON, District Judge, concur.