# Supreme Court of Florida

––––––––––––

No. SC2026-0528

––––––––––––

**JAMES AREN DUCKETT,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

April 30, 2026

PER CURIAM.

James Aren Duckett is a prisoner under sentence of death whose execution has been stayed. In this case, he appeals the circuit court's order denying his request to be provided the underlying DNA testing data necessary for an analysis and opinion by a qualified bioinformaticist. That data was generated by a private laboratory that tested a DNA sample relevant to Duckett's guilt or innocence. Duckett also appeals the circuit court's denial of his demands for public records in which he sought the testing data as well as information pertaining to the private laboratory's

testing process and protocols.[1]

For the reasons that follow, we reverse the circuit court's denial of Duckett's request for the underlying DNA testing data.[2] However, we affirm the court's denial of his public records demands insofar as they sought information regarding the testing process and protocols. Consistent with these holdings, we remand for the underlying testing data to be provided for a statistical analysis, as directed by the Florida Department of Law Enforcement (FDLE). Further, if a dispute arises regarding the extent of the data necessary for analysis, the circuit court shall hold an evidentiary hearing to resolve the dispute.

I

On February 27, 2026, Governor Ron DeSantis signed a warrant scheduling Duckett's execution for March 31, 2026.

---

1. As explained in greater detail below, we have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const.; § 925.11(3)(a), Fla. Stat. (2025); *see also* Fla. R. Crim. P. 3.853(f).

2. To the extent Duckett's public records demands also sought the testing data, we decline to address whether the circuit court abused its discretion in denying the production of such records. Our opinion today renders moot any dispute over the correctness of the circuit court's ruling in this respect.

Following issuance of the death warrant, Duckett filed a motion, which he later amended, seeking postconviction DNA testing under section 925.11, Florida Statutes, and Florida Rule of Criminal Procedure 3.853. The sample he wanted tested was a 1987 swab from the victim's underwear mounted on a slide (called "Q-6(3)"), which had continuously been in the State's possession. The swab contained a small number of sperm heads. Duckett contended that DNA testing would show that the sperm was not his, meaning that someone else committed the murder and he is actually innocent.

Over two decades ago, during Duckett's initial postconviction proceedings, we were informed that certain items of clothing introduced into evidence could possibly be tested for DNA, including Q-6(3). *Duckett v. State*, 918 So. 2d 224, 230 (Fla. 2005). We relinquished jurisdiction to the circuit court to allow for determination of "whether there in fact existed clothing that could be tested for DNA." *Id.* On remand, the examiner for FDLE determined that because Q-6(3) had deteriorated and contained too few sperm heads, the DNA testing methods then available would not have produced any conclusive results. *Id.* The examiner added that any attempt to test the sample would have destroyed it. *Id.*

Outside agencies confirmed the FDLE examiner's concerns. Thus, no testing was performed on Q-6(3). *Id.*

Noting these background facts, Duckett argued in his rule 3.853 motion that Q-6(3) should be tested using Single Nucleotide Polymorphism (SNP), a technology that allows for more reliable DNA testing of small, deteriorated samples. He requested that Q-6(3) be sent to a private laboratory[3] because FDLE does not have the capability to perform SNP testing.

The State agreed that Q-6(3) was potentially exculpatory and therefore focused its arguments on the testing process. Essentially accepting the State's position, the circuit court granted Duckett's motion for DNA testing. Per section 925.11(2)(h), the court permitted the State to exercise complete control over the location, timing, and method of testing. When it became clear that FDLE could not complete the SNP testing, Q-6(3) was ultimately sent to a private laboratory requested by the State called DNA Labs International, Inc. (DLI).

---

3. Duckett asked that the testing be performed by Othram, Inc. He noted that this laboratory had the appropriate capabilities and that FDLE had an existing contract with it.

Meanwhile, two days after his rule 3.853 motion was granted, Duckett filed his fifth successive postconviction motion under Florida Rule of Criminal Procedure 3.851, in which he claimed, among other things, that the forthcoming DNA results would provide newly discovered evidence of his actual innocence.[4]  At the *Huff*[5] hearing, the circuit court learned that DNA testing would not be completed within the timeline contemplated by our scheduling order.  Therefore, the circuit court asked us for an extension of time to allow the DNA testing to be completed and thereby give the court the opportunity to "fully adjudicate the matter."  We granted that request in part and issued a revised scheduling order.

At a subsequent status conference, FDLE explained that testing would likely be completed around March 27, 2026, a date beyond the timeframe contemplated by our revised scheduling order.  In light of this and other facts, Duckett asked the circuit court to stay the execution and to delay ruling on his successive

---

4.  Per our scheduling order and absent a stay, Duckett was required to file his successive postconviction motion before DNA testing results were available.

5.  *Huff v. State*, 622 So. 2d 982 (Fla. 1993).

postconviction motion until the DNA testing was completed. The State, by contrast, urged the court to rule on the motion and allow Duckett to file another successive rule 3.851 motion based on the DNA results, if they were favorable to him. Agreeing with the State, the court issued a final order summarily denying Duckett's successive postconviction motion and declining to stay the execution. As for Duckett's newly discovered evidence claim, the court ruled there was currently no factual basis for granting relief because it had yet to receive the DNA results.

Duckett appealed the summary denial of his successive postconviction motion. He also moved for a stay of execution and petitioned for a writ of habeas corpus. That appeal (case number SC2026-0049) and petition (case number SC2026-0450) are still pending before us.[6] Meanwhile, Duckett filed a motion in circuit court requesting that FDLE provide him the testing data and protocols as soon as the DNA results became available.

On March 26, 2026, we exercised our discretion and granted Duckett's motion for a stay of execution to allow for completion of

_____

6. No one disputes that these matters are within this Court's jurisdiction.

- 6 -

the DNA testing. *See* § 922.06(1), Fla. Stat. (2025) ("The execution of a death sentence may be stayed . . . incident to an appeal.").[7]

Testing was completed the following day. The Certificate of Analysis conveyed that the DNA indicated at least one male contributor. The report went on to conclude that "[d]ue to the limited nature of the DNA calls obtained from this sample, it is not suitable for genealogical comparisons or phenotype and ancestry estimations." In an accompanying email, FDLE relayed that the testing was "inconclusive" and noted that neither FDLE nor DLI has the capability to complete the testing process by performing a statistical analysis on the data that was generated.[8] However, FDLE suggested that a qualified bioinformaticist may be able to perform that analysis and, thus, provide statistical calculations.

At this point, the State asked us to lift the stay of execution,

---

7. Justice Tanenbaum dissented.

8. In the email, FDLE explained that although testing "yielded results for Y (male-specific) SNPs," DLI "has no mechanism to provide a statistical weight associated with only the Y SNP results," which means it is "unable to report a match between Mr. Duckett's Y SNPs and those detected in the sample." By the same token, according to FDLE, this meant DLI also was unable to report an exclusion.

whereas Duckett requested that we relinquish jurisdiction to the circuit court. On March 30, 2026, we issued an order explaining that the circuit court continued to have concurrent jurisdiction to rule on motions related to DNA testing and successive claims filed by Duckett and that nothing in our prior scheduling order precluded these additional filings. Accordingly, we declined to lift the stay and denied Duckett's motion to relinquish as moot.[9]

Thereafter, Duckett asked the circuit court to order that the underlying testing data be released by the State and DLI for a qualified bioinformaticist to perform a statistical analysis. He asserted that this analysis could exonerate him and requested that the circuit court hold an evidentiary hearing to resolve any related factual issues. He also filed public records demands under Florida Rule of Criminal Procedure 3.852(i), seeking the testing data as well as DLI's testing process and protocols. In response, the State asserted that the testing results did not exonerate Duckett but actually inculpate him. It further argued that no analysis of the testing data was necessary because any such analysis would only

_____

9. Justice Tanenbaum dissented in part.

- 8 -

affect the degree of inculpation. The State also objected to the disclosure of DLI's testing process and protocols. Finally, it contended that no evidentiary hearing was required.

After holding two status conference hearings with less than a day's notice and at which no sworn testimony was permitted, the circuit court issued an order denying Duckett's request for the testing data. The court found that Duckett had failed to establish how the information he sought could lead to his exoneration. The court also denied his public records demands on the basis that they were neither "relevant to the subject matter of a proceeding under rule 3.851" nor "reasonably calculated to lead to the discovery of admissible evidence." Fla. R. Crim. P. 3.852(i)(2)(C).

Duckett appeals that order, which concluded rule 3.853 proceedings in circuit court.

## II

Though neither party raises the issue, we begin by addressing our jurisdiction to review the challenged order. *See JJJTB, Inc. v. Schmidt*, 415 So. 3d 129, 132 (Fla. 2025) ("Subject matter jurisdiction is uniquely unwaivable because it concerns a court's constitutional or statutory authority to hear a certain type of case,

- 9 -

and the parties cannot confer such authority on a court." (citing *MCR Funding v. CMG Funding Corp.*, 771 So. 2d 32, 35 (Fla. 4th DCA 2000))). We are satisfied that we have jurisdiction.

Section 925.11(3)(a) provides that "[a]n appeal from the court's order on the petition for postsentencing DNA testing may be taken by any adversely affected party." Likewise, rule 3.853 provides that "[a]n appeal may be taken to the appropriate appellate court only from the final order disposing of the motion." Fla. R. Crim. P. 3.853(f). Lastly, Florida Rule of Appellate Procedure 9.140 confirms that "[a] defendant may appeal . . . orders denying relief under" rule 3.853. Fla. R. App. P. 9.140(b)(1)(D).

Here, the challenged order denied Duckett the relief he sought under rule 3.853, namely for the complete results of his DNA testing. In other words, the order "adversely affected" him. § 925.11, Fla. Stat. Moreover, the order here is "final" as required by rule 3.853(f) because it concluded the rule 3.853 proceedings and brought "an end to the judicial labor," *S. L. T. Warehouse Co. v. Webb*, 304 So. 2d 97, 99 (Fla. 1974). Notably, we have exercised appellate jurisdiction to review final orders denying capital defendants' motions for postconviction DNA testing, citing the

- 10 -

constitutional provision giving us authority to review death-penalty appeals. *E.g.*, *Everett v. State*, 377 So. 3d 1123, 1125 (Fla. 2024); *Reynolds v. State*, 373 So. 3d 1124, 1125 (Fla. 2023).[10]

## III

Duckett argues that the circuit court erred in denying his request for the underlying testing data necessary for a qualified bioinformaticist's analysis and opinion. He contends that without this data he has not been provided the complete testing results, to which he is entitled under section 925.11 and rule 3.853. On this record, we agree.

Section 925.11(2)(i) provides that "[t]he *results* of the DNA testing ordered by the court shall be provided to the court, the

---

10. The dissent argues, in part, that we do not have jurisdiction to address collateral matters in cases where the death penalty has been imposed. None of the cases cited by the dissent lead to that conclusion. Longstanding precedent says just the opposite. *See State v. Fourth Dist. Ct. of Appeal*, 697 So. 2d 70, 71 (Fla. 1997) (holding "that in addition to our appellate jurisdiction over sentences of death, we have exclusive jurisdiction to review all types of collateral proceedings in death penalty cases"); *Willacy v. State*, No. SC2026-0519, 2026 WL 1021168, at *3 (Fla. Apr. 15), *cert. denied*, No. 25-7220, 2026 WL 1074143 (U.S. Apr. 21, 2026); *Trepal v. State*, 754 So. 2d 702, 705-06 (Fla. 2000). We are not convinced that our precedent is "clearly erroneous," *State v. Poole*, 297 So. 3d 487, 507 (Fla. 2020), nor has either party asked us to revisit our prior holdings in this regard.

sentenced defendant, and the prosecuting authority." (Emphasis added); *see also* Fla. R. Crim. P. 3.853(c)(8). In this case, we are persuaded that the complete "results" include the underlying testing data, not simply DLI's report that testing was "inconclusive" when it (and FDLE) lacks the capability to provide the analysis that FDLE suggested may be possible.[11] Our reasoning is twofold.

First, to grant a motion for postconviction DNA testing, section 925.11 requires the court to find, among other things, that "the results of DNA testing of that physical evidence would be admissible at trial." § 925.11(2)(f)2., Fla. Stat.; *see also* Fla. R. Crim. P. 3.853(c)(5)(B). As the State readily concedes, an expert testifying at trial must provide statistical calculations of the testing data when reporting DNA results. *See Brim v. State*, 695 So. 2d 268, 271 (Fla. 1997). An expert cannot simply say there is a "match" between the defendant's DNA and the profile obtained from testing. Against this

---

11. We note that "inconclusive" is not synonymous with "incomplete." Duckett has not received the complete results because he has not been given the underlying data. Nevertheless, it is possible that, after conducting the statistical analysis that FDLE suggests is possible in this case, the entity performing the analysis will be unable to offer a definitive conclusion based on a comparison of Duckett's known DNA and the profile generated from the sample.

backdrop, the statute's reference to "the results of DNA testing . . . be[ing] admissible at trial" suggests that those "results" include the testing data necessary for a DNA expert to offer an opinion at trial.

Second, FDLE itself has suggested that Duckett has received incomplete testing results. On several occasions, it has indicated that the "results" include the testing data upon which DLI's "inconclusive" finding was made. Namely, in an email, FDLE confirmed that the testing "yielded results for Y (male-specific) SNPs" but that both FDLE and DLI have "no mechanism to provide a statistical weight associated with only the Y SNP results." FDLE therefore suggested the following course:

> A qualified bioinformaticist may be able [to] provide an opinion and calculation based on the *Y SNP results.* Speaking only from personal awareness of entities working in this space, I believe Parabon Nanolabs, Inc. and/or Othram, Inc. would be capable of further reviewing the *Y SNP data.*

(Emphasis added.) This phrasing equates the "Y SNP results" with the "Y SNP data," which has yet to be analyzed. FDLE says that another laboratory might be able to perform that analysis on the testing data. Accordingly, this email (along with other statements by FDLE) supports the conclusion that without the underlying data,

- 13 -

Duckett has not been supplied complete testing results.[12]

The State disagrees.[13] Citing the circuit court's ruling below, it argues Duckett failed to show how any analysis of the testing data would exonerate him. In the State's view, it was proper for the circuit court to impose a burden on Duckett to demonstrate, through expert testimony or otherwise, how that analysis would

---

12. The dissent does not expressly engage with our interpretation of section 925.11. It merely asserts, without elaboration, that Duckett has received the testing results. We simply disagree.

Relatedly, the dissent contends that Duckett has requested the underlying data only to impeach DLI's testing process. While Duckett may have sought information regarding DLI's testing *process and protocols* for that purpose, we have denied those requests. But Duckett has also repeatedly asserted (at the status conferences and in his briefing) that a statistical analysis of the underlying data—which neither DLI nor FDLE is able to perform— could exonerate him. Although the dissent suggests that this analysis could never be exonerating, we do not find evidentiary support for that conclusion in the record before us.

13. We observe that in various statements in its answer brief, the State (whether intentionally or not) draws an equivalence between the DNA testing "results" and the testing data. *See, e.g.,* Answer Brief of Appellee at 6 ("Duckett presented no testimony or affidavits to demonstrate that statistical analysis of the results could yield any exculpatory evidence."); *id.* at 13 ("To label the results as anything other than 'inconclusive' requires statistical analysis."); *id.* (noting that "[t]he lower court denied the motion for statistical analysis of the SNP DNA results").

lead to his exoneration.[14]  This argument is meritless.

The circuit court's imposition of this exoneration-based burden *at this stage* has no basis in section 925.11 or rule 3.853. Upon granting Duckett's motion for postconviction DNA testing, the court found that he had met the requirements of the statute and rule—i.e., that he carried his burden.  Once that ruling was made, Duckett was not required to establish anything else to receive the complete results of that testing.  Therefore, the circuit court compounded its error in denying Duckett's request for the underlying data based on his failure to carry a burden that is without legal foundation.

For all of these reasons, we reverse the circuit court's order to the extent it denied Duckett's request for the underlying DNA testing data necessary for analysis.

IV

Duckett also claims the circuit court abused its discretion in denying his demands for additional public records, in which he

---

14. Even so, as noted above, the State insisted that an evidentiary hearing was unnecessary.

sought information about DLI's testing process and protocols.[15]  We find no abuse of discretion.

The circuit court rejected Duckett's demands on the basis that this information was not "relevant to a subject matter of a proceeding under rule 3.851" or "reasonably calculated to lead to the discovery of admissible evidence."  *See* Fla. R. Crim. P. 3.852(i)(2)(C).  We agree that Duckett has failed to allege, as rule 3.852 and our precedent require, how DLI's testing process and protocols could relate to a colorable claim for postconviction relief.  *See Dailey v. State*, 283 So. 3d 782, 792 (Fla. 2019).  Instead, he seeks this information only as possible impeachment evidence.  Therefore, we affirm the circuit court's denial of these demands as to the testing process and protocols.

## V

For the foregoing reasons, we affirm in part, reverse in part, and remand for the full results of Duckett's DNA testing—namely, the underlying data—to be provided to him so that the statistical

---

15.  As we have noted, Duckett also sought the testing data in these records demands.  Given our holding, we decline to address the denial of those demands, finding any dispute regarding them to now be moot.

- 16 -

analysis he seeks may be performed by a qualified bioinformaticist. Furthermore, we instruct the circuit court to hold an evidentiary hearing if any dispute arises as to the extent of the data necessary for analysis.

It is so ordered.

MUÑIZ, C.J., and LABARGA, COURIEL, GROSSHANS, FRANCIS, and SASSO, JJ., concur.
TANENBAUM, J., dissents with an opinion.

NO MOTION FOR REHEARING WILL BE ALLOWED.

TANENBAUM, J., dissenting.

The court has no jurisdiction to consider the appeal in this case. We should dismiss.

I

A

When Florida's citizens revised Article V of their constitution in 1956, they modernized "the Florida judicial system at the appellate level," creating district courts of appeal that would have the "final and absolute" word "in most instances" of review. *Jenkins v. State*, 385 So. 2d 1356, 1357–58 (Fla. 1980). That is to say, the district courts were "meant to be courts of final, appellate jurisdiction" regarding nearly all trial court final judgments and

- 17 -

orders. *Lake v. Lake,* 103 So. 2d 639, 642 (Fla. 1958); *cf.* Art. V, § 5(c), Fla. Const. (1956) (providing for the right to appeal "all final judgments or decrees" to the district court "except those from which appeals may be taken direct to the supreme court or to a circuit court"); *id.* § 4(b) (limiting the right to directly appeal a trial court's final judgment to the supreme court to several very narrow categories, including "judgments imposing the death penalty").

The objective was to relieve the supreme court's extreme case congestion. *Jenkins*, 385 So. 2d at 1358–59. This court's power, in turn, was "limited and strictly prescribed." *Id.* at 1357 (commenting in the context of this court's power "to review decisions of the district courts of appeal"); *cf. Mystan Marine, Inc. v. Harrington*, 339 So. 2d 200, 200 (Fla. 1976) ("The jurisdiction of this Court extends only to the *narrow* class of cases enumerated in Article V, Section 3(b) of the Florida Constitution." (emphasis supplied)). Doing so would leave the supreme court to "function[] as a supervisory body in the judicial system for the State, exercising appellate power in certain specified areas essential to the settlement of issues of public importance and the preservation of uniformity of principle and practice." *Jenkins*, 385 So. 2d at 1357–58.

For this approach to work, though, this court would have to be careful "not to venture beyond the limitations of its own powers by arrogating to itself the right to" engage in review not provided for by the constitution. *Lake*, 103 So. 2d at 642. Yet the court did not heed its own caution, continuing to construe its jurisdiction ever more broadly, once again resulting in "a staggering case load." *Jenkins*, 385 So. 2d at 1358. The supreme court ultimately urged another constitutional amendment, one that would further limit its jurisdiction and essentially save it from its own accretions of authority. *See id.* at 1358–59. The voters approved that amendment, which went into effect in 1980.

To be sure, these increasing jurisdictional limitations still left in place the court's express power to "hear appeals from final judgments of trial courts imposing the death penalty." Art. V, § 3(b)(1), Fla. Const. (1980). Against the historical backdrop just described, though, there is no good reason to read this grant of jurisdiction more broadly than others—so no justification for this court's repeated "venture[s] beyond the limitations" that section 3(b)(1) expressly establishes regarding review of death penalty judgments. *Lake*, 103 So. 2d at 642.

- 19 -

"Our state Constitution is a limitation upon power," so "constitutional jurisdiction" cannot be expanded if doing so "result[s] in a diminution of the constitutional jurisdiction of some other court." *Harry E. Prettyman, Inc. v. Fla. Real Est. Comm'n*, 109 So. 442, 445 (Fla. 1926) (internal quotations omitted); *cf. Hodgson v. Bowerbank*, 9 U.S. 303, 304 (1809); *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 491 (1983). The rule under our modern constitutional structure is that the district court of appeal has exclusive appellate jurisdiction over *all* trial court final judgments and orders "not directly appealable to the supreme court or a circuit court." Art. V, § 4(b)(1), Fla. Const.

Considering, then, the constitutional provision granting this court limited direct review authority in matters involving the death penalty, the text could not be plainer. A final judgment *that imposes the death penalty* is appealable to this court (so *not* appealable to the district court of appeal). But if a trial court order to be reviewed is *not* one imposing the death penalty, it is *not* appealable to this court, *only* to the district court. Reading the scope of our authorized review any more broadly than what the clear text provides necessarily aggrandizes what should be our own

- 20 -

narrow appellate authority at the expense of the broad jurisdiction the constitution expressly gives to the district courts of appeal.[16]

B

That, unfortunately, is what continues to happen in cases like this. Do not lose sight of the only matter on review in this so-called appeal: an order denying free-floating discovery requests related to DNA testing that was both ordered and completed, requests unmoored from any ongoing proceeding attacking the legality of a judgment and death sentence subject to this court's appellate jurisdiction.

To be clear, the petition for DNA testing is not a collateral proceeding attacking the legality of the judgment. A petition filed under section 925.11, Florida Statutes, opens a parallel proceeding,

---

16. I recently explained the historical basis for this court also having jurisdiction over a collateral attack on a judgment imposing the death penalty under this constitutional provision. *See Willacy v. State,* No. SC2026-0519, 2026 WL 1021168, at *8–9 (Fla. Apr. 15) (Tanenbaum, J., concurring in part and dissenting in part) (observing that this court's affirmance of the judgment imposing the death penalty merges with that judgment, such that a motion filed under Florida Rule of Criminal Procedure 3.851 attacking the underlying absolutely final judgment proceeds under our jurisdiction in a way mirroring the coram nobis proceeding that a rule 3.851 proceeding replaced), *cert. denied,* No. 25-7220, 2026 WL 1074143 (U.S. Apr. 21, 2026).

advancing a separate right of action to obtain testing if certain criteria are met. The DNA testing is not a discovery device adjunct to a collateral attack. And the statute is not death-specific. It authorizes DNA testing for any felony, not just in cases in which death has been imposed. *See* § 925.11(1), Fla. Stat. The trial court ordered the DNA testing the defendant requested, the testing was conducted, and the results were provided.

The lab's certificate of analysis said the following as its "results/conclusion":

> These [extracted] items were combined into a single sample for DNA analysis. The DNA profile obtained from this sample indicates at least one male contributor. Due to the limited nature of the DNA calls obtained from this sample, it is not suitable for genealogical comparisons or phenotype and ancestry estimations.

The report attached pages of data purporting to show how that testing was conducted. This is all that section 925.11 requires. *See* § 925.11(2)(i), Fla. Stat. ("The results of the DNA testing ordered by the court shall be provided to the court, the sentenced defendant, and the prosecuting authority."). There is no statutory provision that authorizes follow-up discovery once the results are provided or that provides for continued proceedings to challenge the

integrity or accuracy of the testing or the results.[17]  Simply put, even this independent statutory proceeding, filed in the closed criminal case, is over.

_____

17.  The defendant nevertheless gets away with using as a red herring the Florida Department of Law Enforcement ("FDLE") analyst's characterization about the results and her lack of qualification to offer an opinion about those results' being inconclusive.  The FDLE analyst could not offer an opinion at a hypothetical new trial because she did not conduct the testing, so her comments do not matter.  The information being commented on would be inadmissible hearsay.  *Cf. Linn v. Fossum*, 946 So. 2d 1032, 1038–39 (Fla. 2006); *Smith v. Arizona*, 602 U.S. 779, 796–98 (2024).  Still, the defendant now wants, basically, the "source code" for the testing so that his expert can review and perhaps opine about the reliability of the test results quoted above.  The defendant undoubtedly is using the DNA testing process as an impermissible "fishing expedition."  *Cf. Hitchcock v. State*, 866 So. 2d 23, 27 (Fla. 2004) ("Rule 3.853 is not intended to be a fishing expedition.").

Simply put, though section 925.11 establishes an independent right of action, the action is disposed of once the testing is ordered and the results provided.  It does not create a new "mini-trial" over whether the DNA testing results are probative of the defendant's guilt or innocence.  Any evidentiary hearing instead would occur in a *pending* rule 3.850 or rule 3.851 proceeding.  By contrast, the only purpose of the testing under the statute is to produce results from existing evidence that a defendant contends will definitively *exonerate* him.  *See* § 925.11(1), Fla. Stat.  Exonerating results presumably would be clear and unambiguous, and they would easily support a prompt vacatur of the judgment upon proper post-conviction motion or habeas petition.  That is not what the defendant here is seeking.

The defendant wants data he can feed to an expert he would hire to testify about the testing.  But there are clear limits to what

- 23 -

This court's mandate affirming the trial court's "judgment imposing the death penalty" made that judgment absolutely final in 1990, upon which the trial court lost jurisdiction forever—save for consideration of an *authorized* collateral attack. The trial court summarily denied the post-warrant collateral attack as one that

---

such a "bioinformaticist" could testify to that would be probative of the defendant's *actual* innocence—given that the proposed expert is not the one who conducted the DNA testing, either. The defendant then is not looking for admissible, clearly exonerating evidence; he is seeking evidence to impeach an expert (the lab analyst who *did* conduct the test) who, at best, could testify only why the results do not conclusively *inculpate* him. Any such impeachment evidence could not give rise to doubt about the legality of the judgment imposing the death penalty, which is what a new rule 3.851 motion would have to be based on at this point.

The majority's reliance on *Brim v. State*, 695 So. 2d 268, 271 (Fla. 1997), for its approach is misplaced. That decision addressed the application of the now-defunct *Frye* standard to DNA testing. *See Murray v. State*, 692 So. 2d 157, 161 (Fla. 1997) (noting that in *Brim*, "we reaffirmed our adherence to the *Frye* test for the admissibility of DNA evidence, and clarified that each stage of the DNA process, i.e., the methodology for determining DNA profiles, as well as the statistical calculations used to report the test results— both of which are at issue in the instant case—are subject to the *Frye* test"). With this court's amendment to Florida Rule of Evidence 90.704, "[f]acts or data that are otherwise inadmissible may not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." *In re Amends. to Fla. Evidence Code*, 278 So. 3d 551, 552 n.4 (Fla. 2019).

was time-barred—that is, as one *not* authorized by this court's rules. Indeed, as the defendant admitted during a hearing under rule 3.851(f)(5)(B), his last-minute, post-warrant collateral attack under the rule lacked any exonerating DNA test results constituting newly discovered evidence that would except him from the time bar.[18]

The requests the court now purports to address were made even though there was no pending collateral attack on the judgment imposing the death penalty. It is quite clear, then, that the order on review does not impose the death penalty, and it does not reject an attack on the judgment that originally did.[19] Jurisdiction to review this order can find no textual support in our constitution.

---

18. The majority correctly notes that there is no dispute this court has jurisdiction in case numbers 2026-0449 and 2026-0450. The former involves the final order summarily denying the defendant's last rule 3.851 motion. The latter is the defendant's habeas petition. Our jurisdiction, however, is not free-form; it is tied to the order to be reviewed or the writ being sought. The jurisdiction we have in those two cases cannot support manufacturing jurisdiction over the order in this case, an order produced in a separate proceeding that could have no direct effect on the merits under consideration in case numbers 2026-0449 and 2026-0450.

19. Notably, the defendant still has not attempted to file a new motion under rule 3.851, claiming his actual innocence and

II

A

The majority's response to the clear conflict described above is to rely primarily on the court's "longstanding precedent" that claims exclusive review authority over "all types of collateral proceedings in death penalty *cases.*" *State v. Fourth Dist. Ct. of Appeal*, 697 So. 2d 70, 71 (Fla. 1997) (emphasis supplied). By "collateral proceedings," the court in *Fourth District* seems to have been referencing matters beyond just post-conviction challenges to a *judgment* imposing the death penalty. Before and since, the court has routinely expanded its authority based on its own apparent, non-textual view that it has perpetual authority over the *case* in which the death penalty was imposed, even if the judgment itself has become final and not

---

relying on the results of the DNA test. *Cf. Everett v. State*, 377 So. 3d 1123, 1126 (Fla. 2024) (taking the defendant to task for alleging that the DNA testing "*could* result in an acquittal" rather than explaining that the testing "*will* exonerate" him); *Hitchcock*, 866 So. 2d at 27–28 (criticizing the defendant for failing to meet his burden to explain "*how*" the testing will exonerate him). The defendant already has received all that the statute guarantees to him: the testing of a sample, and the results of that sample. It did not turn out as he had hoped, obviously—otherwise right now he would be vigorously pursuing a new post-conviction motion, claiming that the results exonerate him.

subject to further attack.[20]  Having taken more of a "might makes

right" approach starting in the 1990s and continuing through

present day, this court never has engaged in a textual analysis to

support this otherwise raw exercise of power—routinely citing only

to past practice instead.  *See, e.g.*, *Fourth Dist.*, 697 So. 2d at 71

(citing two decisions from the 1990s for support, even though the

court in both instances simply took jurisdiction, without any

textual consideration); *Trepal v. State*, 754 So. 2d 702, 705–06 (Fla.

2000) (noting that the court has "been less than precise in defining

our authority to" review interlocutory orders "in cases involving

death-sentenced defendants"; quoting the constitutional provision

giving jurisdiction to review a judgment "imposing the death

penalty"; then string-citing cases in which the court previously

---

20.  As I previously explained, "[a]bsent an attack on the judgment and death sentence previously affirmed, this court's appellate jurisdiction under section 3(b)(1) is not implicated in any way," and an active warrant does not "give us extraordinary appellate review powers."  *Willacy*, 2026 WL 1021168, at *10–11 (Tanenbaum, J., concurring in part and dissenting in part).  At the same time, contrary to the majority's characterization, I do not question our *writ* authority, under Article V, section 3(b)(7), to address urgent interlocutory matters, provided there is an independent basis for our appellate jurisdiction—like a pending rule 3.851 proceeding.  *Id.*  Here, we do not have jurisdiction because that appellate jurisdictional hook is missing.

"review[ed] interlocutory discovery orders in capital collateral proceedings . . . although absent an express statement of how the Court determines whether to exercise its jurisdiction").

Though the majority continues this primary reliance on past practice for authority, it does cite four provisions purportedly supporting its jurisdictional claim. First, it cites Article V, section 3(b)(1) of the Florida Constitution, but as explained above, the plain text does not support that claim. Once again, textual treatment of the phrase "judgment imposing the death penalty" demonstrating how the court could have jurisdiction over a mere discovery order, is not on offer. Second, it cites section 925.11(3), which simply restates the constitutional proposition under Article V, section 4(b)(1)—that a trial court's order granting or denying the petition is appealable by the adversely affected party.[21] The statute does not

---

21. The Legislature created a separate right of action to have DNA testing ordered. § 925.11(1), Fla. Stat. ("Petition for Examination"). The defendant moved for a DNA test under the statute and Florida Rule of Criminal Procedure 3.853, and that motion was granted. That grant of relief presumably was a final order that would be appealable as such to the district court having geographical jurisdiction. He did not appeal the order with a claim that he was "adversely affected," so that matter is final and

- 28 -

specify that, in a "death case," the appeal must go to this court; it merely states that an appeal "may be taken," presumably from the final order granting or denying the petition. § 925.11(3)(a), Fla. Stat. Even if it did state that in a death case, the appeal would go to this court, that likely would be an unconstitutional expansion of this court's constitutionally prescribed jurisdiction, as suggested earlier. Third, the majority cites Florida Rule of Criminal Procedure 3.853 and Florida Rule of Appellate Procedure 9.140(b)(1)(D). Neither rule specifies that an appeal could or must be taken to the supreme court, and this court cannot expand its own constitutional jurisdiction—a substantive matter—by procedural rule.[22]

It has been said that "death is different." *Fitzpatrick v. State*, 527 So. 2d 809, 811 (Fla. 1988); *Yacob v. State*, 136 So. 3d 539, 546 (Fla. 2014) (quoting *Fitzpatrick*); *cf. Furman v. Georgia*, 408 U.S.

---

absolute. At all events, the order for a DNA test itself has no effect on the "judgment imposing the death penalty."

22. The Florida Constitution gives this court authority to define jurisdiction by rule only with respect to a district court of appeal's authority to review specified non-final orders. *See* Art. V, § 4(b)(1), Fla. Const. (providing that a district court of appeal "may review interlocutory orders in such cases to the extent provided by rules adopted by the supreme court").

238, 306 (1972) (Stewart, J., concurring) (observing that the "penalty of death differs from all other forms of criminal punishment, not in degree but in kind"). True though this may be, an active death warrant does not excuse a departure from our supposed "commitment to the supremacy-of-text principle"—our "recogni[tion] that the words of a governing text are of paramount concern, and what they convey, in their context, is what the text means." *Planned Parenthood of Sw. & Cent. Fla. v. State*, 384 So. 3d 67, 77 (Fla. 2024) (internal quotations and brackets omitted). If it is true that "we give the words of the constitution their plain, usual, ordinary, and commonly accepted meanings at the time they were written," *City of Tallahassee v. Fla. Police Benevolent Ass'n, Inc.*, 375 So. 3d 178, 183 (Fla. 2023), we should do so consistently, all the time.

A "longstanding precedent" that demonstrably deviates from the clear text is not immune from reconsideration, regardless of the context and regardless of whether anyone has asked for that reconsideration. *Cf. Gamble v. United States*, 587 U.S. 678, 724–25 (2019) (Thomas, J., concurring) ("The true irony of our modern *stare decisis* doctrine lies in the fact that proponents of *stare decisis* tend

to invoke it most fervently when the precedent at issue is least defensible."). We must continuously police our own jurisdictional boundaries; no one can do it for us. Ensuring that we act only within constitutional constraints is an ongoing exercise in self-discipline. Doing so is the true demonstration of judicial restraint.

Our duty always is to apply the law as written. As this court has said:

> In a case where we are bound by a higher legal authority— whether it be a constitutional provision, a statute, or a decision of the Supreme Court—our job is to apply that law correctly to the case before us. When we are convinced that a precedent clearly conflicts with the law we are sworn to uphold, precedent normally must yield.

*State v. Poole*, 297 So. 3d 487, 507 (Fla. 2020); *see id.* (noting that "reliance interests are lowest in cases . . . involving procedural and evidentiary rules" (internal quotations omitted)); *see also Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 248 (2019) (noting that *stare decisis* "is at its weakest when we interpret the Constitution because our interpretation can be altered only by constitutional amendment" (internal quotations omitted)).

## B

In the end, the defendant is gaming the process set out in

section 925.11 to delay execution of his sentence, which he has yet to demonstrate is unlawful, despite his having had decades to do so. His effort, misguided as it is, should have taken place in the context of a pending rule 3.851 motion, where he *would* bear the burden of showing "how" the new information "will" exonerate him. *Hitchcock v. State*, 866 So. 2d 23, 27–28 (Fla. 2004); *Reynolds v. State*, 373 So. 3d 1124, 1126–27 (Fla. 2023). Instead, he is being permitted to circumvent this burden and obtain further delay, using the pending death warrant to manufacture urgency—regarding a closed trial-court proceeding—where none exists. *Cf. Reynolds*, 373 So. 3d at 1127 & n.6 (noting the defendant's failure to pursue DNA testing on certain items in an earlier motion "despite [his] being aware of the[] existence" of items to be tested and the availability of DNA testing methods); *Arango v. State*, 437 So. 2d 1099, 1104 (Fla. 1983) (criticizing "the all too frequent and questionable practice of waiting until the eleventh hour to raise or prosecute issues which could have and should have been raised months or years before"); *Evans v. Bennett*, 440 U.S. 1301, 1307 (1979) (Rehnquist, J., in chambers) (criticizing how, in a death warrant context, "'hydraulic pressure' [can be] brought to bear upon any judge or group of

- 32 -

judges [that] inclines them to grant last-minute stays in matters of this sort just because no mortal can be totally satisfied that within the extremely short period of time allowed by such a late filing he has fully grasped the contentions of the parties and correctly resolved them").

There is no constitutional basis for our intervention in this matter, and the pending death warrant by itself cannot supply it. No textual defense of this court's exercise of jurisdiction in cases like this one has ever been offered, not before and not today. None exists. Our previous exercises of jurisdiction, and the one in this case, have been demonstrated here to be wrong—expressly contrary to the plain jurisdictional statements in the Florida Constitution.

The defendant has had his "day in court"—many days, in fact. Over the decades, this court has rejected his legal challenges to his conviction and sentence of death. Continuing Justice Rehnquist's point from before:

> There must come a time, even when so irreversible a penalty as that of death has been imposed upon a particular defendant, when the legal issues in the case have been sufficiently litigated and relitigated that the law must be allowed to run its course. If [our holdings] are to be anything but dead letters, capital punishment when imposed pursuant to the standards laid down in

those cases is constitutional; and when the standards expounded in those cases and in subsequent decisions of this Court bearing on those procedures have been complied with, the State is entitled to carry out the death sentence. Indeed, just as the rule of law entitles a criminal defendant to be surrounded with all the protections which do surround him under our system prior to conviction and during trial and appellate review, the other side of that coin is that when the State has taken all the steps required by that rule of law, its will, as represented by the legislature which authorized the imposition of the death sentence, and the state courts which imposed it and upheld it, should be carried out.

*Evans*, 440 U.S. at 1303.

The appeal should be dismissed for lack of jurisdiction.

An Appeal from the Circuit Court in and for Lake County,
    Brian Welke, Judge
    Case No. 351987CF001347AXXXXX

Suzanne Keffer, Capital Collateral Regional Counsel, Brittney Lacy, Assistant Capital Collateral Regional Counsel, Mary Elizabeth Wells, Special Assistant Capital Collateral Regional Counsel, and Courtney M. Hammer, Staff Attorney, Southern Region, Fort Lauderdale, Florida,

    for Appellant

James Uthmeier, Attorney General, Tallahassee, Florida, Charmaine Millsaps, Special Counsel, Assistant Attorney General, Tallahassee, Florida, Naomi Nichols, Senior Assistant Attorney General, Daytona Beach, Florida, and Nicole Rochelle Smith, Senior Assistant Attorney General, Tampa, Florida,

    for Appellee